**Deborah S. BROTHERTON, individually, on behalf of those members of the class herein, and as administratrix of the estate of Stephen S. Brotherton; Melissa Brotherton; Carrie Brotherton, Plaintiffs–Appellants (94–3465; 96–3034), Plaintiffs–Cross–Appellees (96–3085),**

v.

**Frank P. CLEVELAND, M.D.; Bethesda, Inc., Defendants– Appellees,**

Eye Bank Association of America, Inc., Defendant–Cross–Appellant (96–3085).

Nos. 94–3465, 96–3034 and 96–3085.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 10, 1998.

Decided April 14, 1999.

John H. Metz (argued and briefed), Cincinnati, OH, for Plaintiffs–Appellants.

Bruce B. McIntosh (argued and briefed), McIntosh, McIntosh & Knabe, Cincinnati, OH, for Defendant–Appellee Bethesda, Inc. in No. 94–3465.

Gordon M. Strauss (briefed), Christian J. Schaefer (argued), Hamilton County Prosecutor's Office, Civil Division, Cincinnati, OH, for Defendant–Appellee Frank P. Cleveland, M.D., in No. 96–3034.

Stephen A. Bailey (argued and briefed), Martin, Bailey & MacDonald, Cincinnati, OH, for Defendant–Appellant Eye Bank Association of America, Inc. in No. 96–3085.

Before: BOGGS and MOORE, Circuit Judges; and DOWD,* District Judge.

---

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District

BOGGS, Circuit Judge.

Deborah S. Brotherton brought two complaints, alleging that the defendants violated Ohio law and the Federal Constitution by removing her dead husband's corneas over her objections. The cases were consolidated; the district court certified a class of plaintiffs; and parties now appeal from various orders. In No. 96–3085, Defendant Eye Bank Association of America cross-appeals from the district court's decision that, as a private party, the Association did not enjoy Eleventh Amendment immunity from Brotherton's suit. In Nos. 94–3465 and 96–3034, Brotherton appeals from the district court's orders granting Eleventh Amendment immunity to Defendant Dr. Frank Cleveland, in his official capacity as Hamilton County Coroner; denying Brotherton's motion for partial summary judgment as to liability; and granting summary judgment to Defendant Bethesda Hospital on the basis of issue preclusion. Because the Eleventh Amendment does not bar Brotherton's suit against Dr. Cleveland in his official capacity, we reverse the grant of summary judgment in his favor; we affirm the other final judgments of the district court.

## I. Background

This case arose from allegations of the theft of body parts from the dead. This appeal concerns consolidated cases that have been ongoing since 1989. Given this tangled posture, we begin by relating some facts and procedural history.

In 1983, Ohio passed a law to permit county coroners to harvest corneas for medical use. Ohio Revised Code § 2108.60 took effect in 1984. It reads:

(A) As used in this section:

. . .

(2) "Eye bank" means a nonprofit corporation that is organized under the laws of this state, the purposes of which include obtaining, storing, and distributing corneas to be used for corneal transplants or other medical or medical research purposes, and that is exempt from federal taxation. . . .

(3) "Eye bank official" means a person authorized by the trustees of an eye bank to make requests for corneas to be used for corneal transplants or other medical or medical research purposes.

(4) "Eye technician" means a person authorized by the medical director of an eye bank to remove the corneas of a decedent.

. . .

(B) A county coroner who performs an autopsy pursuant to section 313.13 of the Revised Code may remove one or both corneas of the decedent, or a coroner may authorize a deputy coroner, physician or surgeon licensed pursuant to section 4731.14 of the Revised Code, embalmer authorized under section 2108.071 of the Revised Code to enucleate eyes, or eye technician to remove one or both corneas of a decedent whose body is the subject of an autopsy performed pursuant to section 313.13 of the Revised Code, if all of the following apply:

. . .

(2) An eye bank official has requested the removal of corneas and certified to the coroner in writing that the corneas will be used only for corneal transplants or other medical or medical research purposes;

. . .

(4) The coroner, at the time he removes or authorizes the removal of the corneas, has no knowledge of an objection to the removal by [the decedent, his spouse, his next of kin, his legal guardian, or someone authorized to dispose of his body].

. . .

(C) Any person who acts in good faith under this section and without knowledge of an objection, as described in

of Ohio, sitting by designation.

division (B)(4) of this section, to the removal of corneas is not liable in any civil or criminal action based on the removal.

OHIO REV.CODE ANN. § 2108.60 (Banks–Baldwin 1998) (hereinafter "the removal statute"). Ohio counties elect individuals to serve four-year terms as county coroners. *See* OHIO REV.CODE ANN. § 313.01 (Banks–Baldwin 1998). The events precipitating this appeal occurred in Hamilton County (Cincinnati), Ohio and involved its county coroner at the time, Dr. Frank Cleveland.

The removal statute permits the harvesting of corneas only if an eye bank official requests their removal and certifies that an eye bank will use the corneas for medical or medical research purposes. *See* OHIO REV.CODE ANN. § 2108.60(B)(2) (Banks–Baldwin 1998). The Eye Bank Association of America ("EBAA") is a nonprofit corporation with member eye banks in forty states. EBAA has a member in Cincinnati, the Cincinnati Eye Bank for Sight Restoration, Inc. ("CEB"). On April 25, 1985, CEB sent a letter to Dr. Cleveland, petitioning the coroner to allow CEB "to remove the corneas of any coroner's case which falls within the guidelines of [O.R.C. § 2108.60]."

Dr. Cleveland responded by directing his subordinates to "cooperate with the Cincinnati Eye Bank to obtain as many corneas as possible." The removal statute, at § 2108.60(4), permits removals only when the coroner "has no knowledge of an objection to the removal by [the decedent or certain others]." Dr. Cleveland established a policy of "intentional ignorance," encouraging subordinates not to seek information on objections to corneal removal. This court has described that approach as a policy "not to review medical records or paperwork pertaining to a corpse prior to the removal of corneas." *Brotherton v. Cleveland,* 923 F.2d 477, 482 (6th Cir.1991) ("*Brotherton I* "). When the coroner's office learned of a death, it would contact CEB, which would send a technician to remove the corneas. Eventually, Dr. Cleveland learned that CEB personnel started inquiring about the existence of objections to removal. In response, he approved a memorandum to his subordinates which read, in part, "If *eye bank* personnel request 'next of kin' information on any of our cases, *IT IS NOT TO BE GIVEN TO THEM.* If they persist in that inquiry, obtain their names and make Jack or Carol aware of the incident." While the joint appendix does not reveal Jack and Carol's identities or job titles, we presume that they were not necessarily safeguarding the best interests of inquisitive eye bank personnel or next of kin.

On February 15, 1988, EMS personnel took Steven Brotherton ("Steven") to the Emergency Room of Bethesda Hospital (North) in Hamilton County. After the hospital staff pronounced Steven dead, they asked his wife, Deborah Brotherton ("Brotherton"), if she would permit an anatomical gift. She refused, citing Steven's beliefs, and the hospital documented this refusal in its record on the "Report of Death." To determine whether Steven committed suicide, the hospital released his body to the county coroner, Dr. Cleveland, whose staff performed an autopsy on February 16. The coroner's office contacted CEB, informed CEB that it could harvest Steven's corneas, and permitted CEB to send a technician to remove the corneas. Brotherton learned about this only when she reviewed the autopsy report, which remarked that Steven's "corneae are absent."

On February 9, 1989, Brotherton filed a complaint in the United States District Court for the Southern District of Ohio. Acting individually and as the administratrix of Steven's estate, and on behalf of her minor children, Brotherton sued, among others, Dr. Cleveland (in his personal and official capacity), EBAA, CEB, Bethesda North, and Bethesda, Inc., the parent cor-

poration of Bethesda North.[1] Attacking the policy and practices of the coroner, hospital, and eye banks, and challenging the constitutionality of the cornea removal statute, Brotherton sought injunctions and damages under 42 U.S.C. § 1983 for due process and equal protection violations. She also asserted pendent Ohio common-law tort claims.

On August 11, 1989, the district court dismissed the case. The judge held that Brotherton had no property interest in Steven's body, rejected her equal protection claim, and dismissed the state claims without prejudice. *See Brotherton I*, 923 F.2d at 479. Brotherton filed a timely appeal. In 1991, this court decided *Brotherton I*, in which we reversed the district court, reaching only the due process issue. We explained that Brotherton had a property interest in Steven's body, that Ohio failed to provide necessary predeprivation procedures, and that "the policy and custom of the Hamilton County coroner's office is an established state procedure necessitating predeprivation procedures." *Id.* at 481–82.

On February 14, 1990, before this court decided *Brotherton I*, Brotherton filed a second complaint in the Southern District of Ohio. That complaint resembled the first, although it included an additional plaintiff whose decedent perished at Bethesda North and suffered the removal of corneas without the permission of the next of kin. As in the first complaint, Brotherton sought injunctions and damages under 42 U.S.C. § 1983 for due process and equal protection violations; she

also asserted unspecified state common-law tort claims.[2] On July 6, 1990 (before this court announced its decision in *Brotherton I* ), the district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6), again holding that Brotherton failed to adduce a constitutional violation. Brotherton appealed.

On June 30, 1992, this court issued *Brotherton v. Cleveland*, 968 F.2d 1214, No. 91–3316, 1992 WL 151286 (6th Cir. 1992) (per curiam) (unpublished) ("*Brotherton II* "). The decision in *Brotherton II* resolved several issues. It explained that: (1) Dr. Cleveland enjoyed qualified immunity in his personal capacity, *see id.* at \*3; (2) Dr. Cleveland could not claim qualified immunity in his official capacity, *see id.* at \*\*4–5; (3) for the purposes of the suit, Bethesda, Inc. did not constitute a state actor, *see id.* at \*5; and (4) the Eye Banks were state actors. *See id.* at \*6.

After this court remanded the second complaint in light of *Brotherton II*, Judge Spiegel consolidated the two cases in August 1992, designating the first complaint as the lead case. In November 1992, he certified the plaintiff class.[3] The district court dismissed Bethesda North and granted summary judgment for Bethesda, Inc. ("Bethesda"). In August 1993, this court sua sponte dismissed Brotherton's appeal from the summary judgment for Bethesda. The district court vacated the previous grant of summary judgment, and turned its attention to class members requesting exclusion. In early 1994, Judge Spiegel again granted summary judgment for Bethesda, designating the order as a

---

1. Brotherton also sought to certify a class of "all beneficiaries and next of kin of decedents who have had their decendent's cornea removed by defendants without permission and/or in reckless disregard of whether there was an objection or refusal by said beneficiaries or next of kin to allow such procedure...."

2. Sometime before December 1991, Brotherton brought a state negligence action against the same defendants. The trial court granted summary judgment for the defendants, and an

appeals court affirmed, finding that Bethesda had no duty to inform the coroner of Brotherton's wishes regarding the corneas. *See Brotherton v. Cleveland,* 76 Ohio App.3d 601, 602 N.E.2d 749, 750–51 (1991), *motion to dismiss denied,* 63 Ohio St.3d 1430, 588 N.E.2d 130 (1992) (table), *jurisdictional motion overruled by,* 64 Ohio St.3d 1416, 593 N.E.2d 6 (1992) (table), *reh'g denied,* 64 Ohio St.3d 1444, 596 N.E.2d 474 (1992) (table).

3. *See* note 1 *supra* (describing the class).

final judgment pursuant to Rule 54(b). The order granting summary judgment disposed of the constitutional claims by relying on *Brotherton II*, which held that Bethesda was not a state actor. It disposed of the state law claims by invoking a state decision holding that Bethesda had no duty to Brotherton. *See* note 2 *supra*. Brotherton appealed the final judgment; that appeal became No. 94–3465, which we resolve herein.

On November 27, 1995, the district court granted Dr. Cleveland's motion for summary judgment and denied CEB and EBAA's motions for summary judgment. In its order, the court held that the Eleventh Amendment prevented Brotherton from suing Dr. Cleveland in his official capacity. The court explained that the county coroner enjoyed immunity because he acted pursuant to an Ohio statute that "induced" the policies he established. The court refused to extend Eleventh Amendment immunity to the eye banks, albeit relying on qualified immunity decisions to reach its conclusion. The court held that, as private parties, the eye banks could not invoke the Eleventh Amendment to foreclose Brotherton's suit. After the court denied a motion for reconsideration, and certified its order as a final judgment under FED.R.CIV.P. 54(b), Brotherton appealed, and EBAA filed a cross-appeal. This court assigned case number 96–3034 to Brotherton's appeal, and 96–3085 to EBAA's cross-appeal.

Anticipating a settlement, this court remanded the three appeals (Brotherton's appeals regarding Bethesda and Dr. Cleveland, and EBAA's cross-appeal regarding the denial of its motion for summary judgment) pursuant to our decision in *First National Bank of Salem, Ohio v. Hirsch*, 535 F.2d 343 (6th Cir.1976). In April 1997, Judge Spiegel recommended returning the matters to the Sixth Circuit and, in January 1998, he repeated this recommendation. On February 3, 1998, this court granted a motion to reinstate the appeal. The case retains Dr. Cleve-

land's name, although he has retired and been replaced by Dr. Carl Parrott. *See* David Holthaus, *New Coroner's Calling: Finding Truth in Death*, CINCINNATI POST, Feb. 23, 1995, at 1A. "[A]ny misnomer not affecting the substantial rights of the parties [to actions against a public officer in his official capacity] shall be disregarded." FED.R.CIV.P. 25(d)(1). Accordingly, we disregard the misnomer, and we look to the merits.

## II. EBAA's Invocation of the Eleventh Amendment

We begin with EBAA's cross-appeal and the question of whether the Eleventh Amendment prevents the district court from exercising jurisdiction over Brotherton's suit against EBAA. On November 22, 1995, the district court granted Dr. Cleveland's motion for summary judgment and denied EBAA and CEB's motions for summary judgment. The court ruled that the Eleventh Amendment barred suit against Dr. Cleveland, but that the Amendment did not prevent Brotherton from suing the eye banks, despite this court's holding in *Brotherton II* that the eye banks were state actors for the purposes of Brotherton's action. *See Brotherton II*, 1992 WL 151286, at \*\*6–7. The district court ruled that the Eleventh Amendment did not prohibit suit against EBAA and CEB, although the court ruled based on analogizing from cases concerning qualified and absolute immunity under § 1983.

Unhappy with the dismissal of Dr. Cleveland, Brotherton moved for reconsideration or, in the alternative, certification of the November 22 order as final insofar as it dismissed the coroner. On December 26, 1995, the district court denied the motion for reconsideration but granted the motion for certification under FED. R. CIV. P. 54(b). In the order, the district court discussed its reasons for certifying the summary judgment as final, although it appears to have certified its November 22 order only insofar as it dismissed Dr. Cleveland. On January 1, 1996, EBAA

cross-appealed from the November 22 and December 26 orders.[4]

■ Initially, we consider whether EBAA properly took its cross-appeal. After all, EBAA lacks grounds to appeal a final judgment under Rule 54(b). First, and most important, the November 22 order did not enter final judgment for or against EBAA; rather, it declined to recognize a jurisdictional bar to the action against EBAA and CEB. By its terms, Rule 54(b) applies only to final judgments. FED. R. CIV. P. 54(b) ("[T]he court may direct the entry of final judgment as to one or more but fewer than all of the claim or parties ... upon an express direction for the entry of judgment."). The November 22 and December 26 orders entered final judgment only for Dr. Cleveland. Second, even if we assume that the district court entered a judgment regarding EBAA, the district court certified only the judgment concerning Dr. Cleveland. This conclusion stems from the text of the order (discussing reasons for certifying the judgment regarding Cleveland), the status of the Rule 54(b) motion (offered by Brotherton, who did not ask for certification of the order regarding EBAA, and not offered by EBAA), and the text of Rule 54(b). Rule 54(b) applies only when a district court does not enter final judgment regarding all of the multiple claims or parties. If the district court entered final judgment regarding each of Cleveland, EBAA, and CEB, then no defendants remain, and there would be no basis to invoke Rule 54(b). "The first step in certification, entry of partial final judgment, is satisfied where some decision made by the district court ultimately disposes of one or more *but fewer than all* of the claims or parties in a multi-claim/multi-party action." *General Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1026–27 (6th Cir.1994) (emphasis added). Else, why have a Rule 54(b)?

Although EBAA does not mention the collateral order doctrine, that method of appeal may represent our only means of exercising jurisdiction over this appeal. The Supreme Court has ruled that, "States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity." *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *see also Williams v. Kentucky*, 24 F.3d 1526, 1543 (6th Cir.), *cert. denied*, 513 U.S. 947, 115 S.Ct. 358, 130 L.Ed.2d 312 (1994). The Court's holding does not explicitly reach private parties, who may well not be "state entities": Puerto Rico Aqueduct was a government instrumentality, not a private firm.

Of course, we have already found that EBAA is a state actor, for purposes of the case. Further, this court has allowed private parties to obtain interlocutory review of denials of qualified immunity, *see Cullinan v. Abramson*, 128 F.3d 301, 303 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998); *McKnight v. Rees*, 88 F.3d 417, 418–19 (6th Cir.1996), *aff'd*, *Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), and similar reasons justify interlocutory review of a denial of Eleventh Amendment immunity. Where a party does not deign to invoke the collateral order doctrine, we have some qualms about exercising jurisdiction under it. Interlocutory appeals are, after all, "the exception, not the rule." *Johnson v. Jones*, 515 U.S. 304, 309, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). We believe, however, that exercising jurisdiction here serves the interests of judicial economy. Our *sua sponte* validation of the exercise of jurisdiction will provide little solace to

---

4. While the district court's opinion denied immunity to EBAA and CEB, CEB does not seem to have appealed; at oral argument, counsel for EBAA explained that CEB chose

not to appeal, and he suggested that a dearth of assets may have motivated the decision. CEB did not file a brief or join EBAA's briefs.

EBAA, for we decide that the Eleventh Amendment does not insulate them from suit.

■ While the district court discussed cases about qualified immunity under § 1983, it decided only that the eye banks may not avoid suit by invoking the Eleventh Amendment. *See Brotherton v. Cleveland,* 908 F.Supp. 502, 507 (S.D.Ohio 1995). The district court found that the Eleventh Amendment did not bar the suit. We agree, although for a different reason.

■ The proper approach asks not whether EBAA should enjoy qualified immunity, and therefore Eleventh Amendment immunity, but instead whether EBAA acted as an arm of the State of Ohio. We answer that question as a matter of federal law, informed by provisions of state law that involve EBAA. *See Regents of Univ. of California v. Doe,* 519 U.S. 425, 429 n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). Most of our sister circuits undertake a multi-factor analysis to decide whether an entity is an arm of the state. *See, e.g., Duke v. Grady Mun. Schs.,* 127 F.3d 972, 974 & n. 4 (10th Cir.1997) (compiling cases and tests from the Second, Third, Fourth, Eighth, and Tenth Circuits). The Eleventh Circuit's test is illustrative; in *Hufford v. Rodgers,* 912 F.2d 1338 (11th Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991), it listed four factors relevant to its inquiry: "how state law defines the entity, what degree of control the state maintains over the entity, where funds for the entity are derived, and who is responsible for judgment against the entity." *Id.* at 1341 (quoting *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.,* 734 F.2d 730, 732 (11th Cir.1984)). The Tenth Circuit provides a helpful overview by categorizing its factors as broadly reflecting "the degree of autonomy of the particular entity ... and the source from which the entity receives its funds, and, in particular, whether a money judgment against the entity would be satisfied out of the state treasury." *Duke,* 127 F.3d at 974 n. 3; *see*

*also Auer v. Robbins,* 519 U.S. 452, 456 n. 1, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (finding a city Board of Police Commissioners not an "arm of the State," where the city shouldered the Board's financial responsibilities and where "the Board is not subject to the State's direction or control in any other respect").

The Supreme Court recently revisited its method for determining whether the Eleventh Amendment bars actions against certain entities. In *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), the Court considered whether the Eleventh Amendment prevented an action under the Federal Employers' Liability Act against the Port Authority of New York and New Jersey. The facts differed from the instant appeal, as Congress approved the creation of the Port Authority in a bistate compact. The legal rule applies, however. Justice Ginsburg, writing for the Court, emphasized one issue: will a State pay if the defendant loses? *See id.* at 48, 115 S.Ct. 394 ("Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations."). Justice Ginsburg elaborated:

> A charitable organization may undertake rescue or other good work which, in its absence, we would expect the State to shoulder. But none would conclude, for example, that in times of flood or famine the American Red Cross, to the extent it works for the public, acquires the States' Eleventh Amendment immunity. [Footnote 21] The proper focus is not on the use of profits or surplus, but rather is on losses and debts. If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No"—both legally and practically—then the Eleventh Amendment's core concern is not implicated.

*Id.* at 51, 115 S.Ct. 394. Footnote 21 reads, in part, "It would indeed heighten a

'myster[y] of legal evolution' were we to spread an Eleventh Amendment cover over an agency that consumes no state revenues but contributes to the State's wealth." *Ibid.*(citations omitted).

The *Hess* opinion focused on the impact on a State treasury, and *Doe* slightly altered that emphasis by establishing that potential liability, not actual ability to pay or indemnification, determines the Eleventh Amendment status of an entity. *See Doe*, 117 S.Ct. at 904–05. Whether we view as dispositive *Hess*'s emphasis on the State treasury, or interpret it as placing significant weight on one factor of a multifactor test, *see, e.g., Harter v. Vernon*, 101 F.3d 334, 338 (4th Cir.1996), *cert. denied,* 521 U.S. 1120, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997), we conclude that EBAA may not properly invoke the Eleventh Amendment.

While EBAA and Brotherton do not discuss EBAA's finances, EBAA makes much of the fact that it is a nonprofit, private corporation. Its "Background Information" sheet shows that it enjoys non-profit status, was established in 1961 by the Committee on Eye Banks of the American Academy of Ophthalmology, and that it includes 87 eye banks in 40 states. Apart from its regulation of all corporations that operate within its borders, Ohio does not appear to exert control over EBAA, and its laws do little more than give EBAA (or, rather, its member eye banks) permission to harvest corneas. *See* Ohio Rev.Code Ann. § 2108.60 (Banks–Baldwin 1998). From the limited evidence in the record, it seems unlikely that Ohio has any financial involvement with EBAA, and there is no evidence that Ohio will pay for a judgment

against EBAA. Thus, upon consideration of EBAA's status under Ohio law, we affirm the order of the district court that the Eleventh Amendment does not bar Brotherton's claims against the eye banks.[5]

### *Qualified Immunity for EBAA*

Although the district court ruled only on the applicability of the Eleventh Amendment, both EBAA and Brotherton devote their appellate briefs to arguing whether EBAA may avail itself of qualified immunity. Their error derives from the district court's inappropriate decision to "[apply] the rationale behind" decisions involving absolute and qualified immunity under § 1983. *Brotherton,* 908 F.Supp. at 506. We do not decide whether EBAA enjoys qualified immunity. To the extent that the district court analogized from cases on qualified immunity, it erred. The preceding discussion establishes the necessary conditions for Eleventh Amendment immunity. Further, because the district court conflated the Eleventh Amendment and qualified immunity issues, and because the parties compound this error on appeal, the district court did not properly rule on this issue, nor have the parties adequately briefed it. The Supreme Court confronted a similar issue in *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). In *Lugar,* a § 1983 action, the Court found that the plaintiff presented a valid cause of action against a corporate creditor and president who acted under color of state law. Justice White, writing for the Court, addressed an objection of a dissenting Justice:

> Justice Powell is concerned that private individuals who innocently make

---

**5.** The outcome does not change if we look for additional guidance to the dissent in *Hess.* In *Hess,* Justice O'Connor, joined by Chief Justice Rehnquist and Justices Scalia and Thomas, disagreed with the majority's emphasis on state financial liability. *See Hess,* 513 U.S. at 59–62, 115 S.Ct. 394 (O'Connor, J., dissenting). Justice O'Connor proposed an emphasis on state control over the entity, asking whether "the State possesses sufficient control over an entity performing governmental functions that the entity may properly be called an extension of the State itself." *Ibid.* Even then, she would find sufficient control only where "the lines of oversight are clear and substantial—for example, if the State appoints and removes an entity's governing personnel and retains veto or approval power over an entity's undertakings...." *Ibid.*We cannot credibly term EBAA "an extension of the State itself."

use of seemingly valid state laws would be responsible, if the law is subsequently held to be unconstitutional, for the consequences of their actions. In our view, however, this problem should be dealt with not by changing the character of the cause of action but by establishing an affirmative defense. A similar concern is at least partially responsible for the availability of a good-faith defense, or *qualified immunity,* to state officials. We need not reach the question of the availability of such a defense to private individuals at this juncture. What we said in *Adickes,* 398 U.S., at 174, n. 44, 90 S.Ct. 1598, ... when confronted with this question is just as applicable today: "We intimate no views concerning the relief that might be appropriate if a violation is shown. The parties have not briefed these remedial issues, and if a violation is proved they are best explored in the first instance below in light of the new record that will be developed on remand. Nor do we mean to determine at this juncture whether there are any defenses available to defendants in § 1983 actions like the one at hand. *Cf. Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288" (citations omitted).

*Id.* at 942 n. 23, 102 S.Ct. 2744 (emphasis added). If EBAA chooses to assert qualified immunity in further proceedings before the district court, the court may develop a record and resolve the issue without any confounding effect of Eleventh Amendment jurisprudence.

### III. Dr. Cleveland's Invocation of the Eleventh Amendment

We turn to Brotherton's claims against Dr. Cleveland in his official capacity. In *Brotherton II,* this court agreed with the district court that Brotherton could not maintain an action against Dr. Cleveland in his personal capacity. *See Brotherton II,* 1992 WL 151286, at **3–4. The decision in *Brotherton II* allowed the plaintiffs to continue against Dr. Cleveland in his official capacity. *See id.* at **4–5. It observed that the suit against Dr. Cleveland, in his official capacity, represented a suit against the "entity of which [he] is an agent." *Id.* at *4 (quoting *Monell v. Department of Soc. Servs. of the City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). This posture reduces the defenses available to Dr. Cleveland (and the entity he represents): "The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment." *Kentucky v. Graham,* 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Trouble arose below because Brotherton and Dr. Cleveland could not agree as to which entity the coroner represented when he fashioned the contested policy.

After the remand from *Brotherton II,* Dr. Cleveland convinced the district court that it lacked jurisdiction. He persuaded the court that, although Hamilton County voters elected him, he acted as an agent of the State of Ohio when he implemented the cornea removal policy of "intentional ignorance" concerning the wishes of decedents and their kin. Because the Eleventh Amendment denies federal jurisdiction over actions against States, the district court dismissed the case against Dr. Cleveland. *Cf. Pusey v. City of Youngstown,* 11 F.3d 652, 657 (6th Cir.1993) ("[S]uits against state officers acting in their official capacities are not cognizable under section 1983."), *cert. denied,* 512 U.S. 1237, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994).

This court reviews de novo a district court's ruling that the Eleventh Amendment bars the suit of a § 1983 plaintiff. *See Hardin v. Straub,* 954 F.2d 1193, 1198 (6th Cir.1992). We conclude that Dr. Cleveland acted as a county, not state, official. This result flows from the prior *Brotherton* decisions, the language of the removal statute, the structure of the Hamilton County coroner's office, and the nature of Dr. Cleveland's policy.

When we evaluated EBAA's attempt to shield itself with the Eleventh Amendment, we mentioned the Supreme Court's decision in *Hess*, as well as the multi-factor tests of several of our sister circuits. *See* pages 560–61 *supra*. Applying the rationale of *Hess* suggests that the Eleventh Amendment does not bar the action: because Hamilton County—rather than the State of Ohio—would satisfy any money judgment against its county coroner, the case does not implicate the Eleventh Amendment. *See Hess*, 513 U.S. at 50, 115 S.Ct. 394. The factors in the multipart tests, whether modified or supplanted by *Hess*, point to a similar result. Each factor militates against Dr. Cleveland, an elected county official, who acts autonomously with no state oversight, *see* OHIO REV.CODE ANN. § 313.06 (Banks–Baldwin 1998), funded by Hamilton County, which presumably will bear financial responsibility for the judgment, and defended by attorneys from the county, not from the State. His autonomy from the county does not preclude county liability, however. *See, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

This finding may not end our inquiry. The preceding paragraph establishes that, in his daily operations, the Hamilton County Coroner acts as an agent of Hamilton County, and not of the State of Ohio. Dr. Cleveland asserts, however, that Ohio law—not personal whim or county mandate—compelled him to craft the contested policy. Essentially, he argues that, for the limited purposes of this suit, he acted as an arm of the State, and he cites for support our 1993 decision in *Pusey v. City of Youngstown*. For this appeal, we will assume that *Pusey* and related cases serve as complements to *Hess* and the multi-factor-test cases, and we view the two lines of decisions as standing for separate propositions: *Hess* resolves the status of Eleventh Amendment immunity for *entities* (bistate compacts, nongovernmental organizations, county governments and officials), while *Pusey* provides a guide for

determining whether to attribute particular actions of a public official to a State or to a smaller political unit.

The district court in *Brotherton* relied on the opinion in *Pusey*. Pusey brought a § 1983 action against Maureen Cronin, a city prosecutor. Pusey alleged that Cronin violated Pusey's First Amendment rights by failing to notify her that, at an upcoming hearing, Cronin would reduce the charges against the killer of Pusey's son. *See Pusey*, 11 F.3d at 654. We held that the suit was not cognizable under § 1983 because "Cronin acted on behalf of the state when she was prosecuting state criminal charges and reduced the charge." *Id.* at 657. "Clearly, state criminal laws and state victim impact laws represent the policy of the state. Thus, a city official pursues her duties as a state agent when enforcing state law or policy." *Ibid.* Here, the district court held that Dr. Cleveland, like Cronin, enforced state law or policy. It supported this conclusion by citing language from *Brotherton I* that Ohio law "induced" the coroner's policy. *Brotherton I*, 923 F.2d at 482.

In *Brotherton I*, the parties did not raise the Eleventh Amendment, so we exercise caution when consulting that decision. In that case, this court decided that Brotherton had a property right in Steven's corneas, and that an unspecified (state or county) government's policy disregarded her rights without affording adequate predeprivation procedures. *See Brotherton I*, 923 F.2d at 482. The court used language favorable to both parties to this appeal. Dr. Cleveland could draw upon language discussing "color of state law," *id.* at 479; remarking that the removal statute "permitted" the removal of Steven's corneas, *ibid.;* stating that "Ohio failed to provide the necessary predeprivation process," *id.* at 482; discussing the presence of an "established state procedure," *ibid.;* and mentioning that the coroner's policy of "intentional ignorance is induced by" the removal statute. *Ibid.* Brotherton could

point to the decision's repeated emphasis that the coroner's office established its own policy: "[t]he custom and policy of the Hamilton County's coroner's office is not to [obtain consent or inspect records]," *id.* at 478; "the coroner's office took advantage of this statute," *id.* at 479; "[u]nder the established policy of the coroner's office, Steven's ... corneas were intentionally taken." *Ibid.* Further, Dr. Cleveland does not mention that the decision refers to *his* policy when it discusses the existence of established "state" procedures: "we merely hold that the policy and custom of the Hamilton County coroner's office is an established state procedure necessitating predeprivation process." *Id.* at 482. Because the court focused on the due process violation, it did not consider the Eleventh Amendment question, and it appears to have used "state" to refer to "nonspecific political entity" rather than "Ohio"; after all, "established state procedure" is a term of art, applying to actions of any governmental entity.

We look beyond *Brotherton I* to the language of the removal statute, which dooms Dr. Cleveland's position. Ohio Revised Code § 2108.60 commands nothing; it has the title "Coroner *may* remove eye for medical use; right of next of kin to object; good faith action protected" (emphasis added). The operative subsection reads:

> (B) A county coroner who performs an autopsy pursuant to section 313.13 of the Revised Code *may* remove one or both corneas of the decedent, or a coro-

ner *may* authorize a deputy coroner, physician or surgeon ..., embalmer ..., or eye technician to remove one or both corneas of a decedent whose body is the subject of an autopsy ..., if all of the following apply....

OHIO REV.CODE ANN. § 2108.60(B) (Banks–Baldwin 1998) (emphases added). The Eleventh Amendment question turns on what this court meant in *Brotherton I* when it discussed the coroner's policy and remarked—almost in passing—that "[t]his intentional ignorance is *induced* by Ohio Revised Code § 2108.60." *Brotherton I,* 923 F.2d at 482 (emphasis added). If this court meant that the removal statute *forced* Dr. Cleveland to adopt the policy of intentional ignorance, the district court correctly found that he acted as an official of the State of Ohio. If by "induced" this court meant only that the removal statute afforded the coroner the latitude to develop implementation policies, and he took advantage of the leeway, the district court erred.

■ The parties disagree about whether to read as "shall" the removal statute's use of "may."[6] That dispute sidesteps the dispositive issue: even if—and it seems far from certain—Ohio law forced Dr. Cleveland to harvest corneas, it did not direct the fashion in which he did so.[7] Ohio law permitted Dr. Cleveland to harvest corneas, but it did not prescribe a specific policy, especially not one which sought to prevent eye bank technicians from inquiring about objections to corneal removal.[8]

---

**6.** Dr. Cleveland concedes that Ohio courts read "may" as "shall" only where a statute clearly evinces the legislature's desire to contravene ordinary rules of usage. He contends that this exception applies to all statutes governing matters of public interest, and that the removal statute implicates a matter of public interest. *Cf. Lapeer County, Mich. v. Montgomery County, Ohio,* 108 F.3d 74, 76–77 (6th Cir.1997) (offering support for the first proposition). This seems far from established and "clear."

**7.** Dr. Cleveland admits that he fashioned the contested policy. After the legislature passed

the removal statute, he consulted with a county prosecutor, although his deposition is replete with unclear answers to questions about the subject matter of the consultations. Regardless, when he developed the policy of intentional ignorance, he did not consult with counsel for the State or county, and he had never consulted with counsel about the statute's meaning regarding objections to corneal harvesting.

**8.** Section 2108.60(C) establishes a defense for those who act "in good faith under this section and without knowledge of an objection...." This suggests that the legislature

We see this case as controlled more by our decision in *Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir.1993), *cert. denied*, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994), than by *Pusey*. Garner's father sued the Memphis Police Department after an officer shot and killed Garner's son, a fleeing burglary suspect. The officer followed city Police Department policy regarding use of deadly force in burglary cases. *See Garner*, 8 F.3d at 361. While not couching its claim as an Eleventh Amendment issue, the Police Department argued that its fleeing felon rules did not constitute a "policy" under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny, which impose municipal liability only where a city makes a "deliberate choice to follow a course of action ... from among various alternatives." *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292. The Department contended that, because it crafted its policy in reliance on a state statute, it was bound to follow the statute.[9] *See Garner*, 8 F.3d at 364.

We rejected this argument. The state statute merely outlined the outer limits of the use of force to apprehend fleeing felons. The Police Department deliberately chose to adopt a more restrictive deadly force policy which refused to authorize the use of deadly force against certain nonviolent suspects. *See ibid.* We held that the Police Department had formulated its own policy, and thus risked § 1983 liability if the policy violated the Constitution: "Defendants' decision to authorize use of deadly force to apprehend nondangerous fleeing burglary suspects was, therefore, a deliberate choice from among various alternatives under *Pembaur*." *Ibid.*

The Memphis Police Department's position resembles that of the Hamilton County Coroner's Office under Dr. Cleveland. In both cases, a State authorized a local entity to act within certain bounds, and the local entity formulated a policy in response. Dr. Cleveland's policy represents a stronger case for liability than in *Garner:* while the Memphis Police Department crafted a policy less expansive than that authorized by the Tennessee statute, Dr. Cleveland's policy of intentional ignorance does not appear grounded in the Ohio statute. Regardless of the scope of the policies, in neither case did the local actor mechanically adopt and enforce, to the letter, a state policy. Instead, the local actor made conscious policy decisions, and thus did not act merely as an arm of the State.

A recent opinion by Judge Easterbrook of the Seventh Circuit corroborates this distinction. It held that, where Illinois law afforded discretion to a county official charged with enforcing its commands, the defendant acted as a county, not state, official, and thus could not invoke the Eleventh Amendment. *See Ruehman v. Sheahan*, 34 F.3d 525 (7th Cir.1994). *Ruehman* involved a § 1983 action against a county sheriff. Illinois state law requires sheriffs to obey court orders, including arrest warrants. The Sheriff of Cook County established a computer system (named SPWA) to track active warrants, but he failed to purge recalled warrants, relied on SWPA, and mistakenly arrested the plaintiffs. *See id.* at 526–27. The *Ruehman* court refused to find that the Sheriff acted as an agent of the State of Illinois. A lengthy passage explains its reasoning:

> The Sheriff has not alerted us to authority that requires him to use any computer system—let alone this one—to track

anticipated different implementation approaches: some coroners would act in good faith, but some might not.

**9.** The state statute read, "If, after notice of the intention to arrest the defendant, he either flee [sic] or forcibly resist [sic], the officer

may use all the necessary means to effect the arrest." *Garner*, 8 F.3d at 364 (quoting Tenn. Code Ann. § 40–808 (1982) (amended 1985) (current version at Tenn.Code Ann. § 40–7–108)).

warrants. A county agency, under the president of the county board, specified the design of SPWA. The system, then, is designed and supervised from top to bottom by the Sheriff and the county government. State law requires the Sheriff to arrest the right people but says nothing about how he should do it. Design and auditing decisions have been left entirely to him. He could junk SPWA tomorrow, or alter its every detail, without thwarting any state policy or law. Each sheriff in Illinois is free to take a unique approach. A suit against the Sheriff would not prevent the state from later taking over the task of tracking warrants through, say, a single computer in the Clerk's Office. SPWA allows the Sheriff to find warrants faster than if he had to check with the Clerk's Office in the first instance, but is not the product of a state directive. It follows that in designing and implementing SPWA the Sheriff is not acting as the State of Illinois.

*Id.* at 529; *see also McCurdy v. Sheriff of Madison County,* 128 F.3d 1144, 1146 (7th Cir.1997).

■ *Ruehman* comports with other decisions regarding county officials sued under § 1983. Where county officials are sued simply for complying with state mandates that afford no discretion, they act as an arm of the State. *See, e.g., Bethesda Lutheran Homes and Servs., Inc. v. Leean,* 154 F.3d 716, 718 (7th Cir.1998) ("When the municipality is acting under compulsion of state or federal law, it is the policy contained in that statute or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury."); *Scott v. O'Grady,* 975 F.2d 366, 371 (7th Cir.1992) (holding that county official acted as arm of the State where official merely executed writ pursuant to state non-discretionary duty), *cert. denied,* 508 U.S. 942, 113 S.Ct. 2421, 124 L.Ed.2d 643 (1993); *Echols v. Parker,* 909 F.2d 795, 801 (5th Cir.1990) (finding that local officials acted as State agents when they enforced a State anti-boycott statute by prosecuting boycotters) ("A county official pursues his duty as a state agent when he is enforcing state law or policy."). This accords with *Pusey,* which found that the county prosecutor acted as a State agent when prosecuting (and reducing) State charges. *See Pusey,* 11 F.3d at 657.

In contrast, this case implicates Dr. Cleveland in his policymaking capacity. Rather than rotely enforce prescribed Ohio law, he voluntarily implemented a policy of corneal harvesting, and he chose the means of enforcing his policy. The essential question asks whether Dr. Cleveland could have chosen not to use his authority under the state statute and how he would use such authority; if he could have opted to act differently, or not to act, he did not act as an arm of Ohio when he formulated and implemented the contested policy. This distinction reconciles *Garner* and *Pusey,* and accords with *Ruehman* and other views. *See Bethesda Lutheran Homes and Servs.,* 154 F.3d at 718 ("[T]he state of mind of local officials who enforce or comply with state or federal regulations is immaterial to whether the local government is violating the Constitution if the local officials could not act otherwise without violating state or federal law."); *Sonnenfeld v. City and County of Denver,* 100 F.3d 744, 749–50 (10th Cir.1996) (applying multi-factor test influenced by *Hess,* commenting on Denver's "great deal of autonomy in local affairs" in Denver's choice to build an airport in accord with a state policy encouraging, but not mandating, airport construction), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Davis v. Ector County, Tex.,* 40 F.3d 777, 784 n. 34 (5th Cir.1994) (distinguishing a district attorney's attempt to enforce an unconstitutional state statute from instances when a "question of the district attorney as policy maker was presented"); *Caminero v. Rand,* 882 F.Supp. 1319, 1325 (S.D.N.Y.1995); *cf. Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292 ("Municipal liability [under § 1983] attaches only

where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.") (discussing the definition of an "official policy" of a municipality). Ohio law allowed Dr. Cleveland to harvest corneas in the course of his actions as a county coroner, but it did not dictate a method. Dr. Cleveland, acting without state compulsion, chose to harvest corneas, and he selected a policy for Hamilton County; he thus acted as an agent of Hamilton County, not of Ohio. Therefore, the Eleventh Amendment does not prevent the district court from exercising jurisdiction over Brotherton's claims against Dr. Cleveland in his official capacity as coroner of Hamilton County.

### IV. The Dismissal of Bethesda on Grounds of Preclusion

■ In February 1994, the district court granted summary judgment for Bethesda. The district court found that previous state and federal court decisions precluded Brotherton's claims against Bethesda. While it did not use the terms "preclusion," "res judicata," or "collateral estoppel," the court obviously invoked the doctrine of issue preclusion. One month later, it entered final judgment for Bethesda pursuant to Federal Rule of Civil Procedure 54(b). Brotherton appealed. We affirm the district court's judgment.

■ Brotherton's complaints sought relief under 42 U.S.C. § 1983 and under Ohio common-law tort principles. A § 1983 plaintiff may not sue purely private parties. See, e.g., Christy v. Randlett, 932 F.2d 502, 504 (6th Cir.1991) (requiring, as precondition to valid § 1983 claim, that plaintiff sue a person who acted under color of state law). The district court properly cited Brotherton II for the proposition that Bethesda did not act under color of law. See Brotherton II, 1992 WL 151286, at * 5 ("Merely failing to transmit information does not constitute sufficient 'joint action' to make Bethesda a state actor for purposes of § 1983.").

Brotherton's state law complaints do not invoke specific torts, but they allege that "Bethesda Hospital made no effort to communicate and negligently and intentionally failed to communicate the denial of the anatomical gift to the Hamilton County Coroner's office" and that Bethesda, Inc., lacked procedures for conveying decedents' wishes to those desirous of decedents' corneas. The district court properly held that Bethesda did not have a duty to Brotherton. Ohio state courts have already disposed of Brotherton's "simple negligence" claim by finding that Bethesda had no duty to Brotherton. See Brotherton v. Cleveland, 76 Ohio App.3d 601, 602 N.E.2d 749, 750–51 (1991), motion to dismiss denied, 63 Ohio St.3d 1430, 588 N.E.2d 130 (1992) (table), jurisdictional motion overruled by 64 Ohio St.3d 1416, 593 N.E.2d 6 (1992) (table), reh'g denied, 64 Ohio St.3d 1444, 596 N.E.2d 474 (1992) (table).

■ Brotherton's attempt to resurrect its constitutional and negligence claims runs afoul of Ohio's doctrine of issue preclusion (also known as collateral estoppel). These facts satisfy Ohio's test for issue preclusion: (1) Bethesda and Brotherton were parties to Brotherton II and the state case; (2) both cases ended in final judgments on the merits (which include summary judgments) after a full and fair opportunity to litigate the issues; (3) both issues were necessary to the final judgments; and (4) Brotherton does not assert that the issues in this appeal differ from the issues decided in Brotherton II and the state case. See Hapgood v. City of Warren, 127 F.3d 490, 493–94 (6th Cir.1997) (requiring federal courts to give preclusive effect to Ohio state court judgments, discussing Ohio law of preclusion, and observing that Ohio treats summary judgments as valid, final judgments), cert. denied, —— U.S. ——, 118 S.Ct. 1361, 140 L.Ed.2d 511 (1998); Balboa Ins. Co. v. S.S.D. Distribution Sys., Inc., 109 Ohio App.3d 523, 672 N.E.2d 718, 720–21 (republishing preconditions for invoking doctrine of collateral estoppel), appeal denied, 76 Ohio St.3d

1477, 669 N.E.2d 859 (1996) (table); *Cashelmara Villas Ltd. Partnership v. DiBenedetto,* 87 Ohio App.3d 809, 623 N.E.2d 213, 215–16 (1993) ("A prior judgment estops a party ... from subsequently relitigating the identical issue raised in the prior action.").[10]

Brotherton virtually concedes defeat on this issue. In her brief, Brotherton contends that the district court erred by denying a motion to submit evidentiary material to counter Bethesda's motion for summary judgment. Brotherton does not explain the nature of the material—not that it matters, because preclusion bars Brotherton's legal claims and the issues therein. The district court did not err in finding that preclusion doctrines barred Brotherton's claims against Bethesda.

## V. The Denial of Summary Judgment for Brotherton on Liability

On September 14, 1994, Judge Speigel denied Brotherton's motion for partial summary judgment as to the liability of the defendants. Brotherton did not file a notice of appeal until fifteen months later, on December 26, 1995, after the district court granted summary judgment for Dr. Cleveland and dismissed him from the suit. In that notice of appeal, Brotherton purported to appeal from that judgment "and from any other final orders rendered by this court." We lack jurisdiction over an appeal from the September 14, 1994 order, as that order is not "final." *See Swint v. Chambers County Comm'n,* 514 U.S. 35, 41–43, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) (unanimous) (ruling that the denial of a summary judgment motion presented neither a final order nor an appealable collateral order). Even if Brotherton may petition for premature appellate review by piggybacking the issue of liability on her appeal from the order concerning Eleventh Amendment immunity, we decline to exercise whatever discretionary pendent appellate jurisdiction we may have. *Cf. Swint,* 514 U.S. at 50–51, 115 S.Ct. 1203 (explaining that, at least where district court's rulings are unrelated, courts of appeal may not exercise " 'pendent party' appellate jurisdiction" to review nonfinal orders); *Brennan v. Township of Northville,* 78 F.3d 1152, 1157–58 (6th Cir.1996).

## VI. Conclusion

Because the Eleventh Amendment does not prevent the district court from exercising jurisdiction over Brotherton's claims against Dr. Cleveland in his official capacity as Hamilton County Coroner, the district court's judgment to the contrary is REVERSED. In all other respects, the district court's judgment is AFFIRMED. We REMAND the case to the district court for further proceedings consistent with this opinion.

---

10. Brotherton does not assert that the issues in this appeal differ from those resolved by the prior state and federal decisions. Even if the tort claims differ from the negligence claim resolved by the state decision, the doctrine of claim preclusion bars litigation of whatever new theory Brotherton might assert.

*See Hapgood,* 127 F.3d at 494 ("It is irrelevant that the plaintiff, in the second action, is prepared to present evidence or theories of the case not offered in the first action, or that the plaintiff seeks remedies not previously demanded.").