*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0268p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ROBERT WARD CADY,

                *Plaintiff-Appellant,*

     *v.*

ARENAC COUNTY and CURTIS G.
BROUGHTON, individually and in his official
capacity as Arenac County Prosecutor,

                *Defendants-Appellees.*

No. 08-1795

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 07-11369—Thomas L. Ludington, District Judge.

Argued: March 13, 2009

Decided and Filed: July 30, 2009

Before: MARTIN and GILMAN, Circuit Judges; ZOUHARY, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Russell C. Babcock, THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellant. Jason David Kolkema, JOHNSON, ROSATI, LABARGE, ASELTYNE & FIELD, P.G., Lansing, Michigan, for Appellees. **ON BRIEF:** Russell C. Babcock, Victor Joseph Mastromarco, Jr., THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellant. Jason David Kolkema, JOHNSON, ROSATI, LABARGE, ASELTYNE & FIELD, P.G., Lansing, Michigan, for Appellees.

      GILMAN, J., delivered the opinion of the court, in which ZOUHARY, D. J., joined. MARTIN, J. (pp. 16-21), delivered a separate concurring opinion.

_____

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.   This case raises the question of whether Robert Ward Cady's constitutional rights were violated when the Arenac County Prosecutor required Cady, as a condition for dismissing the criminal assault and battery charges pending against him, to enter into an agreement to temporarily refrain from filing a civil lawsuit against the parties with whom he had had a physical altercation.   The district court granted summary judgment in favor of both Arenac County and the Arenac County Prosecutor, concluding that the prosecutor's actions were protected by absolute prosecutorial immunity.   Although we do not fully agree with the district court's analysis, we **AFFIRM** its judgment for the reasons set forth below.

## I.  BACKGROUND

### A.       Factual background

On the evening of September 4, 2004, police officers were dispatched to the property of Robert Seaman in response to a call claiming that a person was being restrained after he was observed breaking into vehicles.   Seaman was having a Labor Day party that evening at his residence.   The officers arrived to find Cady being assisted in getting up from the ground.   According to the police report, the officers received conflicting accounts about what had taken place.   Cady first claimed that he was hit by a water balloon coming from the Seaman property as he drove by and that, when he sought to investigate, individuals from the Seamans' party assaulted him.   He then changed his story and claimed that he stopped at what he believed was a friend's house and that individuals "jumped him."   The officer interviewing Cady noted that Cady emitted "the odor of intoxicants."   This caused the officer to administer a breathalyzer test, which showed that Cady had a blood-alcohol level of 0.101.

In contrast, the four individuals at the Seamans' Labor Day party (Robert Seaman, Marcia Seaman, Scott Diebold, and Thomas Kolczynski) told the police that

Cady came onto the Seaman property and assaulted Robert Seaman. After Robert called out for help, the other three at the party came to assist him. They restrained Cady until the police arrived. A fifth individual, Robert Dewar, told one of the officers that while Cady was being held down, he saw Diebold punching Cady in the head "about five times." The police then re-interviewed Diebold, a corrections officer based in New York, and further questioned his account of the events. They ultimately discredited Dewar's story and told him to leave the property because he "was getting everyone excited." Several of the individuals involved, including Cady, appeared to have injuries. During his deposition, Assistant Prosecutor Vollbach described Cady as having gotten "the worst of the tussle."

After the officers evaluated these conflicting accounts, Cady was arrested and taken into custody. He spent the night in jail and was released the following afternoon, having been issued a citation and charged on a "weekend warrant" with two state misdemeanor counts of assault and battery.

In April 2005, Cady entered into a Deferred Prosecution Agreement (DPA) with Assistant Prosecutor Vollbach, which provided in pertinent part as follows:

> The Defendant, Robert Ward Cady, voluntarily and understandably agrees to the dismissal of the current charges pending against him: two counts of Assault and Battery, subject to the following conditions:
>
> 1.      During the next six (6) months, I will demonstrate my desire to live within the law by not violating any statute of the State of Michigan requiring criminal intent.
>
> 2.      During the next six (6) months, I will not be arrested for any criminal acts or traffic violations more serious than a civil infraction.
>
> 3.      If Defendant Cady pursues any civil claims or remedies against the victims or other participants pertaining to the incidents relative to this matter, People will reissue charges.
>
> I, Robert Ward Cady, agree to the above terms and conditions and understand that if I violate any of the terms of this agreement during the next six (6) months, the Prosecution will re-issue the current charges pending against me.

Cady signed the DPA, but later claimed that he did so "with the understanding that the provision was unconstitutional." He did not, however, communicate this belief to the Arenac County Prosecutor's Office. Assistant Prosecutor Vollbach acknowledged during his deposition that the Prosecutor's Office had never before executed a DPA containing similar waiver-of-civil-claims language, but said that he had done so to allow a six-month "cooling-off" period between the parties to the altercation.

Less than five months later, Cady nonetheless filed a civil lawsuit against the Seamans, Diebold, and Kolzcynski in the county circuit court. The complaint alleged assault, battery, and negligence arising out of the events of September 4, 2004. Upon learning of the civil lawsuit, Arenac County Prosecutor Curtis Broughton and Assistant Prosecutor Vollbach decided to reissue the criminal charges against Cady. Cady pled not guilty, and was ultimately acquitted by a jury on all charges.

**B.     Procedural history**

In March 2007, Cady filed a claim pursuant to 42 U.S.C. § 1983 against Arenac County and County Prosecutor Broughton in the United States District Court for the Eastern District of Michigan. The complaint alleged that the defendants violated Cady's constitutional rights under the Petition Clause of the First Amendment by including the waiver-of-civil-claims language in the DPA.

After discovery was completed, the district court heard oral arguments relating to the defendants' Motion for Dismissal and Summary Judgment. It later issued a memorandum opinion in favor of both defendants. The court found that because Broughton is a "policymaker with final decision-making authority," Cady had stated a claim that met the requirements for suing Arenac County as set forth in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). It also concluded that, based upon the factors laid out in Justice O'Connor's concurring opinion in *Town of Newton v. Rumery*, 480 U.S. 386 (1987), and substantially adopted by the Sixth Circuit in *Coughlen v. Coots*, 5 F.3d 970 (6th Cir. 1993), the DPA's release-dismissal provision did not serve the public interest and was unenforceable due to "prosecutorial overreaching."

Nonetheless, the district court held that Cady's claim was barred by absolute prosecutorial immunity. The court identified the following three acts of the prosecutor as being challenged by Cady: (1) the issuance of charges against Cady, (2) the inclusion of the waiver-of-civil-claims language in the DPA, and (3) the prosecution of Cady. Citing *Imbler v. Pachtman*, 424 U.S. 409 (1976), the court concluded that all three acts are subject to absolute prosecutorial immunity, a doctrine that protects prosecutors from claims brought under 42 U.S.C. § 1983. The court therefore granted summary judgment in favor of both defendants and dismissed Cady's complaint. Cady timely appealed.

## II. ANALYSIS

### A.      Standard of review

We review de novo a district court's grant of summary judgment. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.      Immunity issues

"An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler*, 424 U.S. at 419 n.13. If absolute immunity applies to the defendants, we do not need to reach the substantive issues such as whether the DPA is unenforceable under the factors set out in *Rumery*. *See Imbler*, 424 U.S. at 419 n.13. Because Cady brought suit against County Prosecutor Broughton in both his individual and official capacities, we will separately analyze the issue of whether this immunity applies to Broughton in his individual capacity, to

Broughton in his official capacity, and to Arenac County. "Whether absolute immunity protects a defendant from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews de novo." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) (citation omitted).

### a.       *Broughton in his individual capacity*

The Supreme Court in *Imbler* held that "a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution" was not amenable to suit under § 1983. 424 U.S. at 410. This rationale, however, did not extend to a prosecutor whose "responsibility . . . cast him in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430-31.

The district court identified three types of actions taken by the prosecutor: (1) the issuance of charges against Cady, (2) actions connected with the DPA, and (3) the prosecution of Cady at trial. Under *Imbler*, the issuance of charges against Cady and the prosecution of those charges clearly fall "within the scope of [the prosecutor's] duties in initiating and pursuing a criminal prosecution." *See id.* at 430; *see also Burns v. Reed*, 500 U.S. 478, 490-91 (1991). This leaves the key question of whether Broughton's actions in connection with the waiver-of-civil-claims language in the DPA also fall within the scope of his duties as an advocate. No case within this circuit has decided that question.

"[P]rosecutors are absolutely immune from liability under § 1983 for their conduct . . . insofar as that conduct is intimately associated with the judicial phase of the criminal process." *Burns*, 500 U.S. at 486 (citation and internal quotation marks omitted). "Since the [Supreme] Court's decision in *Imbler*, courts have taken a functional approach to absolute immunity." *Spurlock v. Thompson*, 330 F.3d 791, 797 (6th Cir. 2003). "The analytical key to prosecutorial immunity . . . is advocacy—whether the actions in question are those of an advocate." *Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006) (citations and internal quotation marks omitted). "If the challenged actions of the prosecutor were not performed in his role as

advocate, if they do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings, then only qualified immunity applies." *Id.*

But courts will bar § 1983 suits arising out of even unquestionably illegal or improper conduct by the prosecutor so long as the general nature of the action in question is part of the normal duties of a prosecutor. *Imbler*, 424 U.S. at 413, 430 (holding that a prosecutor accused of knowingly presenting false testimony at trial is protected by absolute immunity); *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986) (holding that a prosecutor's alleged "use of perjured testimony[,] the non-disclosure of exculpatory information[,] . . . conflict of interest problems [,] and . . . spy allegations" are all "related to the acts of an advocate and thus come within the area of prosecutorial immunity"); *Heidelberg v. Hammer*, 577 F.2d 429, 432 (7th Cir. 1978) (holding that a prosecutor is absolutely immune from a suit claiming that he destroyed and falsified evidence).

In its order granting summary judgment, the district court concluded that the use of the DPA was itself "integral to the judicial process of adjudicating Plaintiff's guilt or innocence." The court based its conclusion on the fact that a Michigan statute grants the county court the authority to permit such "release-dismissal agreements" and to grant the prosecution's motion for a *nolle prosequi*. *See* Mich. Comp. Laws § 771.1(2). This analysis, however, strikes us as inapposite insofar as it focuses on the action and authority of the *county court* rather than the conduct of the county prosecutor.

No Sixth Circuit case squarely addresses the question of whether entering into a release-dismissal agreement like the DPA in the present case is conduct "intimately associated with the judicial phase of the criminal process." But numerous cases from this circuit, following the analysis of the Supreme Court in *Rumery*, have established the validity of release-dismissal agreements as "legitimate criminal justice tools." *Rumery*, 480 U.S. at 393 (holding that the release-dismissal agreement entered into by the plaintiff and the prosecution was enforceable); *see also MacBoyle v. City of Parma*, 383 F.3d 456, 461 (6th Cir. 2004) (same); *Coughlen v. Coots*, 5 F.3d 970, 975 (6th Cir. 1993)

("*Rumery* indicates that under ordinary circumstances it is not improper for prosecutors to obtain releases as a part of a . . . dismissal of criminal charges.").

The *Rumery* factors, as adopted by the Sixth Circuit, require courts to consider, among other things, whether a release-dismissal agreement "was executed under judicial supervision." *Rumery*, 480 U.S. at 401-02 (O'Connor, J., concurring); *Burke v. Johnson*, 167 F.3d 276, 285 (6th Cir. 1999) (holding that a release-dismissal agreement "executed under judicial supervision" counted in favor of the agreement's enforceability (citation and internal quotation marks omitted)). Although these cases are concerned with whether a release-dismissal agreement is *enforceable*, their conclusions indicate that entering into such an agreement with a criminal defendant is one way in which a prosecutor may choose to resolve a case in his "role as advocate" for the state.

Moreover, the DPA in this case bears a resemblance to plea bargains that prosecutors routinely enter into with criminal defendants. Conduct associated with plea bargains has long been held by this court to be "so intimately associated with the prosecutor's role as an advocate of the State in the judicial process" as to warrant absolute immunity. *Cole v. Smith*, No. 97-5964, 1999 U.S. App. LEXIS 20353, at *6 (6th Cir. Aug. 24, 1999); *see also Roberts v. Johnson*, No. 86-5952, 1987 U.S. App. LEXIS 2308, at *2-3 (6th Cir. Feb. 17, 1987) (holding that actions taken in connection with a plea bargain were "taken within the scope of the prosecutor's duties" and therefore subject to absolute immunity); *Doe v. Phillips,* 81 F.3d 1204, 1210 (2d Cir. 1996) ("[T]he negotiation of a plea bargain is an act within a prosecutor's jurisdiction as a judicial officer."); *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1492 (10th Cir. 1991) (holding that absolute immunity attaches to plea bargaining activity "due to its intimate association with the judicial process").

In the instant case, the DPA was followed by Assistant Prosecutor Vollbach's motion for *nolle prosequi*. At least one other circuit has held that a decision to move for *nolle prosequi* is within the bounds of absolute immunity. *Brooks v. George County*, 84 F.3d 157, 168 (5th Cir. 1996) (holding that a prosecutor's act "of requesting that the court enter an order of *nolle prosequi*" of the defendant's criminal charges was

"intimately associated with the judicial phase of the criminal process" (citation and internal quotation marks omitted)). But Cady argues that County Prosecutor Broughton should not receive absolute immunity because Broughton was not carrying out his duty as a prosecutor when he authorized Assistant Prosecutor Vollbach to enter into the DPA. Cady insists that Broughton was instead "improperly acting solely as the advocate for the alleged victims (and not the state)." As the line of absolute-immunity cases make clear, however, a prosecutor's allegedly improper motive alone is not enough to defeat absolute immunity, so long as the general nature of his actions falls within the scope of his duties as an advocate for the state. This is particularly true here, where Cady is challenging only one provision of the DPA, not the document as a whole. Nor did Cady present any proof that Broughton had any personal motives to benefit the Seamans or their relatives, or refute Broughton's contention that the purpose of the DPA's release-dismissal provision was simply to provide a six-month "cooling off" period between the parties.

Cady has pointed to no authority, in this circuit or elsewhere, that supports his contention that a prosecutor's actions in connection with the negotiation and entry of a release-dismissal agreement is outside the scope of a prosecutor's role as an advocate. The defendants, on the other hand, have persuasively argued that County Prosecutor Broughton's actions in connection with the DPA should be covered by absolute immunity.

Absolute immunity "defeats the suit at the outset." *Imbler*, 424 U.S. at 419 n.13. This leaves us with no need to reach the issue of whether County Prosecutor Broughton in his individual capacity violated Cady's First Amendment rights. The district court therefore properly granted summary judgment with respect to Cady's claim against Broughton in the latter's individual capacity.

### b.     *Broughton in his official capacity*

"In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993). "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Indeed, there is caselaw suggesting that a lawsuit against an officer in his official capacity and against the governmental entity, such as a city, are functionally the same and should therefore be subjected to the same analysis. *See, e.g.*, *Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007) (explaining that "an official-capacity claim is in substance a claim against the municipality"). We believe, however, that Cady's claims against County Prosecutor Broughton and against Arenac County should be analyzed separately for the sake of clarity. The immunity issue in this subsection is therefore limited to a discussion of the claim against Broughton in his official capacity.

Absolute immunity is a personal defense that is unavailable in an official-capacity action. *Graham*, 473 U.S. at 166-67. Contrary to the district court's analysis, therefore, County Prosecutor Broughton is not entitled to absolute prosecutorial immunity in his official capacity. "The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." *Id.* at 167. Both sides have apparently considered Broughton solely as an employee of Arenac County. The defendants, in particular, never put forth an argument that Broughton was functioning as an agent of the state—and is thus entitled to sovereign immunity—in his dealings with Cady. We nonetheless conclude that Broughton was in fact acting as an agent of the state and that Cady's suit against him in his official capacity is barred by the Eleventh Amendment.

The Eleventh Amendment bars § 1983 suits against a state, its agencies, and its officials sued in their official capacities for damages. *Graham*, 473 U.S. at 169. Whether a county prosecutor is deemed a "state official" depends, at least in part, on state law. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)

(holding that whether an entity should be treated as "an arm of the State" rather than as a municipal corporation "depends, at least in part, upon the nature of the entity created by state law"). This court in *Pusey*, for example, held that city prosecutors are considered state officials under Ohio law when they "are responsible for prosecuting state criminal charges." 11 F.3d at 657. "Thus, a city official pursues her duties as a state agent when enforcing state law or policy." *Id.*

The facts of this case are essentially the same as in *Pusey*. Under Michigan law, county prosecuting attorneys are charged with the duty of "appear[ing] for the state or county, and prosecute or defend . . . all prosecutions, suits, applications and motions, whether civil or criminal, in which the state or county may be a party or interested." Mich. Comp. Laws § 49.153 (2008). This formulation indicates that county attorneys in Michigan, like their counterparts in Ohio, are responsible for enforcing criminal laws on behalf of the state. In the instant case, Cady was charged with and prosecuted for two counts of assault and battery under Michigan Compiled Laws § 750.81(1), a part of the state penal code. We have previously determined that state criminal law represents the policy of the state. *Pusey*, 11 F.3d at 657. This means that County Prosecutor Broughton was acting "as a state agent when prosecuting state criminal charges." *See id.* Cady's suit against Broughton in his official capacity should therefore be treated as a suit against the state. *See Graham*, 473 U.S. at 167.

Our concurring colleague believes, however, that *Pusey* is distinguishable from the present case. Relying on *Brotherton v. Cleveland*, 173 F.3d 552 (6th Cir. 1999), the concurring opinion concludes that because County Prosecutor Broughton was not "rotely" enforcing state law when he entered into the DPA, he was not acting as an arm of the state. *See id.* at 566. We respectfully disagree.

*Brotherton* held that a local coroner's implementation of a cornea-removal policy that was not mandated by state law belied his contention that he was acting as an arm of the state. The *Brotherton* court explained that when considering whether a contested policy is state policy, the essential question is the degree of discretion possessed by the official in question in implementing the contested policy. *Id.* But the language of

*Brotherton* makes clear that the "essential question" of discretion applies only to *policy* choices and not to individual acts by the official in enforcing state law.

The reason for this distinction is that even in "rote" enforcement actions, a prosecutor must make a myriad of choices, such as "whether to prosecute, what targets of prosecution to select, what investigative powers to utilize, what sanctions to seek, plea bargains to strike, or immunities to grant." *Erikson v. Pawnee County Bd. of County Comm'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001) (citation and internal quotation marks omitted). If any of these decisions negated "state action" simply because the prosecutor could have "act[ed] differently, or not at all," *see Brotherton*, 173 F.3d at 566, then very few prosecutorial actions would be considered "state action." Such a position is not supported by *Brotherton* or by other caselaw. *See id.* (citing with approval several cases, including *Pusey*, that held that local officials had acted as state agents when they enforced state statutes).

This case concerns a single action—the decision to enter into the DPA—by County Prosecutor Broughton. A widespread "policy" is not implicated here. As the concurrence points out, the DPA was the first and only such agreement ever entered into by the county prosecutor's office. The question, therefore, is not whether Broughton could have resolved the case in another manner, but whether the DPA was carried out as part of his prosecutorial duties in enforcing state law.

We conclude that the situation here is analogous to a plea bargain, which has long been considered to be one of the "critical prosecutorial decisions." *See Erikson*, 263 F.3d at 1154; *see also Santobello v. New York*, 404 U.S. 257, 260 (1971) ("[T]he disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice."). Prosecutor Broughton had determined, pursuant to his duty as a state prosecutor, that the best way to resolve Cady's case was to drop charges against Cady in exchange for a six-month "cooling off" period. His actions were sufficiently analogous to plea bargaining to be considered as duties executed as an arm of the state.

The Eleventh Amendment has long been interpreted to bar federal courts from exercising jurisdiction over actions against a state brought by her own citizens. *Papasan v. Allian*, 478 U.S. 265, 276 (1986). "Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, . . . a State cannot be sued directly in its own name regardless of the relief sought." *Graham*, 473 U.S. at 167 n.14 (citation omitted); *see also Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985) ("[W]e require an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment.") "An official can . . . be sued in his official capacity. But an official-capacity suit against a state official is deemed to be a suit against the state and is thus barred by the Eleventh Amendment, absent a waiver . . . ." *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992) (citing *Graham*, 473 U.S. at 169). The Supreme Court recognizes an exception to this rule if an official-capacity suit seeks only prospective injunctive or declaratory relief. *Papasan*, 478 U.S. at 276-78. In the instant case, however, Cady sued the Arenac County and County Prosecutor Broughton for compensatory and punitive damages, not for injunctive or declaratory relief.

The question remains whether we may sua sponte raise the issue of sovereign immunity when neither the parties nor the district court appears to have considered it. The Supreme Court has issued somewhat contradictory holdings on this matter. In *Edelman v. Jordan*, 415 U.S. 651, 678 (1974), the Court said that the Eleventh Amendment "sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *See also Atascadero State Hosp.*, 473 U.S. at 238 n.1 ("The principle that the jurisdiction of the federal courts is limited by the sovereign immunity of the States is, without question, a reflection of concern for the sovereignty of the States . . . ." (citation and internal quotation marks omitted)). Later, the Court retreated from the "jurisdictional bar" language in *Wisconsin Department of Corrections v. Schacht*, 524 U.S. 381, 389 (1989), and instead described the Eleventh Amendment as "grant[ing] the State a legal power to assert a sovereign immunity should it choose to do so." If the defense is not raised, said the Court, a court need not "raise the defect on its own" and may simply "ignore" the issue. *Id.*

The Sixth Circuit has largely followed the "jurisdictional bar" approach in *Edelman* by holding that a federal court "can raise the question of sovereign immunity sua sponte because it implicates important questions of federal-court jurisdiction and federal-state comity." *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (citation omitted); *see also Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006) ("Like subject-matter jurisdiction, a sovereign-immunity defense may be asserted for the first time on appeal, and it may (and should) be raised by federal courts on their own initiative." (citations omitted)); *Mixon v. Ohio*, 193 F.3d 389, 397 (6th Cir. 1999) (stating that a federal court "may sua sponte raise the issue of lack of jurisdiction because of the applicability of the eleventh amendment" (citation and internal quotation marks omitted)). We are thus persuaded that we have the authority to raise the issue of sovereign immunity even though it has not been asserted by County Prosecutor Broughton's counsel, and that Cady's suit against Broughton in his official capacity should be barred by the Eleventh Amendment. In sum, the district court reached the right result for the wrong reason regarding this aspect of Cady's § 1983 claim.

### c.     *Arenac County*

We now turn our attention to Arenac County as the remaining defendant in this case. Units of local government are not entitled to sovereign immunity under the Eleventh Amendment. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 369 (2001). Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), a plaintiff suing a unit of local government, such as a county, must identify an unconstitutional policy or custom in order to prevail on a § 1983 claim against it. *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) ("[W]e have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.") A single act by a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action ordered" may suffice in demonstrating that policy or custom. *Pembaur v.*

*Cincinnati*, 475 U.S. 469, 481 (1986). Cady alleges that County Prosecutor Broughton is such a decisionmaker.

But as explained above, when County Prosecutor Broughton made the decisions related to the issuance of state criminal charges against Cady, the entry of the DPA, and the prosecution of Cady, he was acting as an agent of the state rather than of Arenac County. His actions therefore cannot be attributed to Arenac County, and Arenac County cannot be held liable for Broughton's actions even if those actions violated Cady's rights. *See Pusey*, 11 F.3d at 659 ("[The prosecutor] was acting on behalf of the state when she prosecuted state criminal charges and therefore her actions in prosecuting the charges, at that point, could not be attributed to the city."). Cady did not allege any Arenac County policy or custom, apart from Broughton's actions, that violated his rights. The district court therefore properly dismissed Cady's § 1983 claim against Arenac County, once again reaching the right result for the wrong reason.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

**CONCURRENCE**

---

BOYCE F. MARTIN, JR., concurring.  I concur in the majority opinion except with respect to Cady's claim against county prosecutor Broughton in his official capacity.

The majority rejects Cady's claim by *sua sponte* declaring it barred by the Eleventh Amendment. But unlike federal jurisdiction, which "can neither be waived nor assumed," *United States v. Gagnon*, 553 F.3d 1021, 1023 (6th Cir. 2009), Eleventh Amendment immunity is waiveable, both expressly or because it has not been raised, *see Atascadero State Hospital v. Scanlon*, 473 U. S. 234, 238 (1985).

Yet today the majority confusingly (and incorrectly) implies both that appellate courts *must* raise Eleventh Amendment immunity on their own, and, alternatively, that we merely retain the authority to do so. Only the latter is correct: we *may* raise the question of sovereign immunity, *see S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008), but the question remains when we should, *see, e.g., Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."). Notwithstanding some dicta—*see Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006) ("[S]overeign immunity . . . may be asserted for the first time on appeal, and it may (and should) be raised by federal courts on their own initiative.")—the cases the majority cites do not support its view that Eleventh Amendment sovereign immunity must be raised by federal courts whenever they detect the faintest whiff of its presence.

For example, in *Nair*, sovereign immunity was *actually raised*, albeit as an alternative defense; the *Nair* Court's dicta came during its explanation of why it addressed the immunity defense rather than the merits. 443 F.3d at 474. And in *S&M*

*Brands, Inc. v. Cooper*, this Court addressed sovereign immunity but did so only after requesting additional briefing on the question, something the majority here had no interest in. *Cf. S&M Brands,* 527 F.3d at 507 ("We asked for and received from the parties supplemental briefs on the issue.") (citing *Nair*, 443 F.3d at 474).

Moreover, at oral argument, counsel for Broughton and the county was asked whether he relied on Eleventh Amendment immunity. He carefully explained that he had considered that option and declined to raise that defense. This vigorous opposition of friendly questioning from the bench may not have been the wisest litigation maneuver, but it was honest and makes the majority's desire to reach out and decide the question not merely the raising of an issue *sua sponte*, but instead the *overriding* of an *explicit* waiver, albeit one made at oral argument.

And there was a good reason for the county's counsel not to rely on Eleventh Amendment immunity: it likely does not apply. I, like the majority, have of course not had the benefit of briefing on this question—so I, also like the majority, cannot claim perfection. But I disagree with the majority's conclusion that county prosecutor Broughton acted as an arm of the state when he proposed the release-dismissal agreement. Eleventh Amendment immunity ought not apply.

The majority is correct that claims against individuals in their "official capacities" are in essence claims against the government itself. But counties and other municipalities are not states, so such officials only receive sovereign immunity when they "act as an arm of the state." *Brotherton v. Cleveland*, 173 F.3d 552, 563 (6th Cir. 1999). In holding that Broughton so acted, the majority exclusively relies on *Pusey v. Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993), and asserts that "the facts of this case are essentially the same as in *Pusey*." Hardly. Pusey sued county prosecutor Maureen Cronin under § 1983, alleging that Cronin violated Pusey's First Amendment rights by failing to notify her that Cronin would reduce the charges against the killer of Pusey's son at an upcoming hearing. We rejected her claim, reasoning that "Cronin acted on behalf of the state when she was prosecuting state criminal charges and reduced the charge." *Id.* at

657. The majority thinks *Pusey* analogous because Broughton filed criminal charges against Cady, which was the execution of state criminal law.

But Cady does not challenge the prosecution of the criminal charge, or even release-dismissals abstractly. He instead challenges the content of the release-dismissal agreement here—i.e. the requirement that Cady not sue in civil court for six-months any of the other people involved. There is simply no analogue for that in *Pusey*. Indeed, whether that particular release-dismissal condition was permissible is governed by the standard this Court has articulated for distinguishing between situations where local officials merely carry out state policy (and therefore act as an arm of the state) or whether they act in their own, local, policymaking capacity (and therefore do not). As we have explained: "The essential question asks whether [the local official] could have chosen not to use his authority under the state statute and how he would use such authority; if he could have opted to act differently, or not to act, he did not act as an arm of [the state] when he formulated and implemented the contested policy." *Brotherton*, 173 F.3d 566. By contrast, the Eleventh Amendment bars the claim if the official "rotely enforce[d]" state law or merely "compl[ied] with state mandates that afford no discretion." *Id.*[1]

Here, it is evident that Broughton was not "rotely" "complying" with state law: he used his position as county prosecutor to make a policy choice to enter into a release-dismissal agreement and, more importantly, to include in that agreement a requirement that Cady not sue several others in *civil court*. The majority's conclusion otherwise rests on two assumptions: first, the bald assertion that no "policy" is implicated, and, second, an attempt to restate the "essential question" differently than did *Brotherton* to assume

---

[1]*See, e.g., Ruehman v. Sheahan*, 34 F.3d 525, 529 (7th Cir. 1994) ("The Sheriff has not alerted us to authority that requires him to use any computer system—let alone this one—to track warrants. A county agency, under the president of the county board, specified the [system's] design of SPWA. . . . State law requires the Sheriff to arrest the right people but says nothing about how he should do it. Design and auditing decisions have been left entirely to him. He could junk SPWA tomorrow, or alter its every detail, without thwarting any state policy or law. Each sheriff in Illinois is free to take a unique approach. A suit against the Sheriff would not prevent the state from later taking over the task of tracking warrants through, say, a single computer in the Clerk's Office. SPWA allows the Sheriff to find warrants faster than if he had to check with the Clerk's Office in the first instance, but is not the product of a state directive. It follows that in designing and implementing SPWA the Sheriff is not acting as the State of Illinois.").

a conclusion. The proper question here is whether, even assuming that release-dismissals generally are within a prosecutor's mandated duties (not at all clear), the contents of that agreement also were within his mandated duties. It is hardly novel that an agent might have general authority to enter into an agreement of some kind but nevertheless can exceed his authority in the final agreement's specific terms. In other words, a prosecutor acts on his own (or at least only on the county's) behalf when he exceeds the authority expressly delegated to him by the state. This principle does not make his action unlawful, but it means that sovereign immunity, a defense afforded only to the state itself, does not extend to every action by every official of a local polity. *See McCurdy v. Sheriff of Madison County*, 128 F.3d 1144, 1146 (7th Cir. 1997) ("The added wrinkle here, however, is that by delaying the service of the arrest warrant for so long, the sheriff's office may have exceeded the scope of its delegated state authority, may have ceased, therefore, to be an arm of the state . . . . If that is what happened here, this suit would probably be against the deputy in his personal capacity; but it would be (also or instead) against the sheriff in his official capacity if the deputy had been acting pursuant to a policy of the sheriff."); *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694 (1978).

Instead, the majority makes the above assumptions based on its myopic view that we cannot look beyond the act of the release-dismissal agreement itself and into its contents. Release-dismissals are not like plea bargains: the justification for plea bargains focuses on the prosecutor's duties with respect to his limited institutional role and his concern for often limited prosecutorial resources. Release-dismissals, by contrast, concern only whether the defendant may sue the officers who apprehended him for constitutional violations (arguably within the prosecutorial duties), or some extant third-parties in *civil court* (far attenuated from typical prosecutorial duties). Indeed, states generally disfavor release-dismissal agreements as a policy matter, *see, e.g. The Legal Ethics of Release-Dismissal Agreements: Theory and Practice*, 1 Stan. J. Civ. R. & Civ. L. 371 (2005), and, as far as I can tell, a release-dismissal that purports to dismiss the defendant's civil claims against third-parties is a rarity—at oral argument the county's lawyer told us that the prosecutor had never done this before and has not done it since.

Thus, in my view, Cady's suit against Broughton in his official capacity is not barred by the Eleventh Amendment.**²**

Yet, again, neither I nor the majority had the benefit of any briefing on this question; the majority's total certainty is thus not reassuring. And it is undoubtedly true that we are more likely to misstep when we decide questions without any briefing by counsel. It is more prudent to resist this powerful seduction to think ourselves equal to the great common law jurists and make pronouncements on every possible legal question, presented or not. Indeed, it would be prudent to abstain here, where the county has waived immunity and we do not have the benefit of any additional briefing.

I nevertheless concur in the judgment because I would hold the release-dismissal agreement here—though unwise and potentially unseemly—enforceable. This Court, in reliance on the Supreme Court's opinion in *Newton v. Rumery*, 480 U.S. 386, 399 (1987), has explained that a release-dismissal agreement is enforceable if it was (a) voluntarily made, (b) not the product of prosecutorial overreaching, and (c) in the public interest. *Coughlen v. Coots*, 5 F.3d 970, 973 (6th Cir. 1993) (citing *Rumery*, 480 U.S. at 399) (O'Connor, J., concurring in part and concurring in the judgment)). Some of the cases have used "prosecutorial misconduct" instead of "prosecutorial overreach," but, while a showing of legally cognizable police "misconduct" would be sufficient, it is not necessary. The inquiry under *Rumery* and our cases is whether the agreement was voluntary and whether the agreement furthered the public interest. For example, Rumery's own attorney drafted the release-dismissal agreement and counseled his client at length on its benefits and implications, and the prosecutor's decision to seek a civil release was motivated largely by a desire to insulate Mary Deary, the key witness in a

---

**²***Erickson v. Pawnee County Bd. Of County Comm'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001) is completely inapposite: the quote the majority pulls from that case only supported the Tenth Circuit's conclusion that a defendant's due process rights were not violated when the prosecutor employed a private attorney to provide additional research; it was the prosecutor who fulfilled his normal duties. And indeed, a county prosecutor can choose who to offer immunity to, but that says nothing about whether, having done so, he is entitled to sovereign immunity. Although the plaintiff in *Erickson* raised Eleventh Amendment immunity, the court did not address it.

related aggravated sexual assault case, from the need to testify at Rumery's criminal trial or in his civil suit.

This case lacks most of those compelling facts. Here, the prosecutor sought to insulate people involved in some sort of altercation from civil liability. Choosing to prosecute only Cady was well within the prosecutor's discretion, but it seems a bit bizarre that he would seek to prevent Cady from filing a civil suit. Although prosecutors are entrusted with protecting the public, it is unusual for one to try to shape local civil enforcement. Indeed, prosecutors lack any special insight into whether such civil lawsuits might succeed, and the results in this case are a testament to that fact: Cady violated the release-dismissal agreement and sued some of the others involved, and at oral argument the counsel told us that Cady obtained a sizable settlement from them, while he was acquitted of all charges that the prosecutor brought against him related to this incident.

But, in my view, one aspect of the release-dismissal agreement brings it within the public interest: it had a time-limit of six-months. Had Cady waited six-months (well under the statute of limitations for the civil claims he brought), all sides agree that the release-dismissal would have been fulfilled and he both could have brought his civil claims and been successfully released from criminal charges against him. The attorney for the county asserted that this was simply to effect a "cooling off" period, and I think that enough, barely, to save this agreement.

I concur.