NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0351n.06

No. 21-4123

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ERICA BOJICIC, dba Evolve Dance
Company, LLC, et al.,

      Plaintiffs-Appellants,

v.

RICHARD MICHAEL DEWINE, individually
and in his official capacity as the Governor of
the State of Ohio, et al.,

      Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Aug 22, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF
OHIO

OPINION

Before: BOGGS, MOORE, and GRIFFIN, Circuit Judges.

BOGGS, Circuit Judge. In the first months of the Covid-19 pandemic, Ohio ordered "non-essential businesses" to close. A group of owners of small businesses included in that category sued in federal court, alleging that various state and local officials violated their constitutional rights by issuing those orders. The district court dismissed the complaint for failure to state a claim. We affirm.

### I.    Background

The Plaintiffs own dance studios throughout Ohio. Each owner faced various restrictions during the pandemic. From March 20, 2020 through May 22, 2020, businesses not deemed "essential" (including dance studios) were ordered to close. Thereafter, the Plaintiffs' businesses

were allowed to open subject to certain restrictions, including having customers and staff wear masks.

Defendants are certain state and local officials in Ohio, ranging from the Governor and members of the Ohio Department of Health to county and municipal health officials. In response to the closure of their dance studios, the Plaintiffs brought three claims against these Defendants in their individual and official capacities: (1) violation of their "right to work" as protected by the Fourteenth Amendment; (2) violation of the Equal Protection Clause; and (3) a taking without just compensation. For relief, the Plaintiffs sought a declaration that their rights had been violated and damages pursuant to 42 U.S.C. § 1983.

Several Defendants moved to dismiss for failure to state a claim. One Defendant, Eric Zgodzinski (Health Commissioner for Toledo-Lucas County), filed a motion for judgment on the pleadings. Several other Defendants were voluntarily dismissed. Two of the motions were filed by groups of Defendants together: A group of municipal health commissioners (the "Local Defendants"), and a group of State health officials and the Governor of Ohio (the "State Defendants").

The district court granted Defendants' motions and dismissed the claims with prejudice. First, the court held that the Plaintiffs had failed to sufficiently plead their claims by (1) lumping the Defendants together and failing to attribute any action to any specific Defendant; (2) failing to identify any specific pandemic-related orders; and (3) peppering the complaint with conclusory statements. The district court explained that it could dismiss on that basis alone, but went on to describe three other reasons for dismissal. The first of those was that the Plaintiffs lacked standing. While the court found that the Plaintiffs had stated an injury-in-fact, it held that they failed to meet their burden in showing that the harmful actions were traceable to any Defendants except for the

2

former Ohio Director of Public Health, Amy Acton. Next, the court held that the three claims alleged in the complaint were substantively meritless. Then, the court held that the Eleventh Amendment barred the Plaintiffs from obtaining money damages from any of the Defendants in their official capacities and that, in any event, the defendants were protected by qualified immunity. Finally, the court criticized the Plaintiffs for filing what was, in its view, a frivolous brief.

## II.    Analysis

### A.  Whether the Plaintiffs Have Standing to Sue Each Defendant

To access federal courts, a litigant must establish the "irreducible constitutional minimum" of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). That minimum consists of three elements: that the plaintiff has suffered an "injury in fact," that the injury is "traceable" to the defendant's action, and that a favorable decision by the court will likely redress the harm. *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

The district court focused on the traceability element and observed that the Plaintiffs had not alleged any facts tying their injuries to any Defendant other than Amy Acton. We agree.

Traceability refers to "whether the defendant's actions have a 'causal connection' to the plaintiff's injury." *Turaani*, 988 F.3d at 316 (quoting *Lujan*, 504 U.S. at 560). The problem here is that, with one exception, the Plaintiffs did not (1) identify any specific shutdown orders that harmed them nor (2) attribute any individual actions to any individual defendant.

As the district court observed, the complaint fails to identify any public-health orders, except for referring once to orders issued on or around March 20, 2020. It is reasonable to infer, as the district court did, that at least one of the orders is the March 21, 2020 order issued by the Ohio Department of Health and signed by then-director Defendant Amy Acton. That document, originally submitted alongside Defendant Zgodzinski's motion to dismiss, has now been included with the Plaintiffs' opening brief. The order expressly commands all dance studios to close immediately to prevent the spread of Covid-19. The Plaintiffs also include two other orders in an addendum to their brief: a March 22, 2020 order requiring Ohio residents to stay at home and cease non-essential business activities and a May 22, 2020 order allowing dance studios to reopen with certain restrictions, both signed by Defendant Acton. Those orders, though, are never referred to with any specificity in the complaint, and the Plaintiffs did not include them alongside the complaint or any filings in the district court.

Nevertheless, we join the district court in inferring that the complaint identifies the March 21, 2020 order issued by Amy Acton as a source of injury. That injury can therefore be "traced" to her. But the complaint failed to identify any orders issued by any other Defendant. Indeed, the complaint never identifies any specific action taken by any specific Defendant at all. Instead, the Plaintiffs lump the various Defendants together in a variety of vague, conclusory allegations. For example, the Plaintiffs claim:

- "Defendants issued Director's Order which designated certain businesses as essential in the state of Ohio and all other businesses as non-essential."
- "Defendants destroyed [the Plaintiffs'] businesses by the publication that [the Plaintiffs] were unsafe and were ordered closed and/or restricted and/or determined non-essential."
- "Defendants ordered that 'social distancing' be required."

- "Defendants DeWine, McCloud, Vanderhoff, Francis, Acton, and Himes ignored the requirements of law and acted as 'despots' as Ohio Revised Code Section 161 was violated by these Defendants."
- "The General Assembly of the State of Ohio was intentionally, maliciously ignored and deceived by a rouge [sic] governor and his appointees and staff."

Those allegations, and other similar ones, fall short of demonstrating that the Plaintiffs' injury is traceable to the Defendants other than Acton. *See Lanman v. Hinson*, 529 F.3d 673, 684 (2008) ("[C]laims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.").

In response, the Plaintiffs first argue that the district court is treating them unfairly. They claim that, in a prior case, the district court admonished Plaintiffs' counsel to file shorter complaints. In their view, "[t]he district court cannot order [the Plaintiffs] to keep briefs concise and limit attachments on one hand and then dismiss for failure to include more facts on the other." In support of this argument, the Plaintiffs have filed a motion for this court to take judicial notice. With that motion, the Plaintiffs include two transcripts of discussions among the Plaintiffs' counsel and the district court in a separate, unrelated case. Presumably, the Plaintiffs want this court to take judicial notice of the fact that the judge told them he has an eye condition and therefore preferred more concise filings. Two sets of Defendants oppose this motion because it improperly seeks to supplement the record with evidence that was not before the district court.[1]

This motion does not appear to supplement the record or provide any new facts related to the actual claims. However, we can take notice of prior judicial acts. *See United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012). So, to the extent the Plaintiffs seek judicial notice of the fact

---

[1] One of the responses to this motion was incorrectly docketed as a motion for judicial notice.

5

that the district court judge explained in a separate case that he has an eye condition and preferred shorter complaints, we grant the motion.

We do not, however, adopt the Plaintiffs' desired implication, which is that this statement somehow excuses their failure to plead specific facts. The judge's statements encouraging concision cannot be taken to allow a complaint to contain only conclusory statements and treat numerous defendants without distinction.

Next, the Plaintiffs argue in their brief that the State and Local Defendants *did* harm them. They point to various statutes that authorize penalties for failing to follow State public-health orders and authorize the Ohio Department of Health generally to make rules to combat the spread of contagious diseases. They continue that it "was common knowledge in March 2020 that civil and criminal penalties existed for failure to abide by the health department's orders." Even if the threat of enforcement could give the Plaintiffs standing to sue for damages as opposed to injunctive relief (an issue we do not decide), the complaint does not suggest that any Defendant actually sought to enforce those penalties against them. Therefore, any harm suffered by the Plaintiffs cannot be traced to that putative discretion.

The Plaintiffs go on to argue that "Ohio Officials admit that they acted as an arm of the state, which demonstrates traceability for the purposes of standing." The Plaintiffs are referring to a brief by a group of county health commissioners, who argued before the district court that the Eleventh Amendment bars suits against local government officials who carry out state orders. We understand that argument to mean that *even if* the local officials had enforced the orders against the Plaintiffs, they would still have been immune from suit in their official capacities. It is not an admission that Defendants did in fact take any action against the Plaintiffs. Indeed, in that same brief those Defendants argued that the Plaintiffs had no standing to sue them.

6

Finally, the Plaintiffs argue that the Local Defendants all had "discretion" to adopt and enforce the orders, "and not every locality did so adopt and enforce them." Whether or not that statement is true, it does not change the fact that the Plaintiffs never claimed that their particular localities sought to enforce the orders against them.

The Plaintiffs do allege in their complaint that "each" Defendant threatened to enforce these orders and "did signal such intent by their communications and declarations to the public, including publishing the order(s) on their website to the public." They add that "some businesses were still limited further due to the orders of their local health departments." However, the Plaintiffs failed to include any specific instance of posting an order in the complaint. They have therefore failed to show that, even assuming that publicizing orders (state or local) could be actionable, any harm that might have come from such action is traceable to the Local Defendants.

In sum, the Plaintiffs have not pointed to any actions taken by any Defendant (other than Amy Acton) that harmed them. They have therefore failed to plead that the harm they complain of is traceable to the other Defendants. For that reason, they do not have standing to sue those Defendants, and the district court correctly held those Defendants must be dismissed from this case.[2]

## B. Merits of the Constitutional Claims

The district court also held that the Plaintiffs had failed to allege plausible § 1983 claims. We review dismissal on that basis de novo. *Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). Because the Plaintiffs have demonstrated standing to sue only Acton, we consider the claims only insofar as they relate to her.

---

[2] The district court also dismissed the complaint against the Defendants (other than Acton) for failure to state a claim and for failure to comply with Rule 8's pleading standards. Because we hold that the Plaintiffs have not demonstrated standing to sue those Defendants, we need not reach those issues.

### a. Eleventh Amendment Immunity

The complaint was brought against the Defendants in their individual and official capacities. Acton is immune in her official capacity. *Cady v. Arenac Cnty.*, 574 F.3d 334, 344 (6th Cir. 2009) ("[A]n official-capacity suit against a state official is deemed to be a suit against the state and is thus barred by the Eleventh Amendment, absent a waiver.") (quoting *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992)). Ohio has not waived its sovereign immunity for these kinds of cases. *Mixon v. State of Ohio*, 193 F.3d 389, 397 (6th Cir. 1999). Acton is not, however, immune from suit in her individual capacity.

### b. Substantive Due Process

#### 1. Whether Strict Scrutiny Applies

The Plaintiffs argue that Defendants violated their substantive-due-process rights by restricting their right to work. According to the Plaintiffs, because this right is a fundamental one, any restrictions against it must be analyzed with strict scrutiny. But the Plaintiffs do not cite any cases for that proposition. The Supreme Court has recognized that some version of what Plaintiffs style their "right to work" is guaranteed by the Fourteenth Amendment. *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999) ("[T]he liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation."). Still, the Court has never recognized the "right to work" as a "fundamental" right such that actions inhibiting it are subject to strict scrutiny.

In response, the Plaintiffs note that the Constitution cannot be ignored, even during a public-health emergency. They then argue that the "pursuit of a common calling" is one of the fundamental rights protected by Article IV's Privileges and Immunities Clause and by "a parity of

reasoning" also the Equal Protection Clause. Article IV's Privileges and Immunities Clause, though, does not protect the same rights as the Fourteenth Amendment's Equal Protection Clause. Instead, it is geared towards protecting citizens of one state from being discriminated against by a different state. *See McBurney v. Young*, 569 U.S. 221, 226 (2013). While the Privileges and Immunities Clause does guarantee a "right to work," reference to the phrase "fundamental right" in that context does not mean that we must apply strict scrutiny when analyzing the Plaintiffs' Fourteenth Amendment claims.

The Plaintiffs also conflate the substantive-due-process analysis with an equal-protection analysis, citing cases denying the right to work on the basis of race. But the Plaintiffs do not argue that they are being discriminated on the basis of race. And a bare citation to the Ninth Amendment and *Griswold v. Connecticut*, 381 U.S. 479, 488 (1965), does not bridge the gap in support for the Plaintiffs' position.

Typically, when a challenged restriction "does not target a suspect class, burden a fundamental right, or 'shock the conscience,' [it] is therefore subject to rational basis review." *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 806 (6th Cir. 2005). The Plaintiffs do not claim to be a suspect class and a "right to work" has not been recognized as a "fundamental" right within the context of the Fourteenth Amendment. Nor do the Plaintiffs specifically argue that the orders "shock the conscience." Strict scrutiny, then, cannot be the appropriate standard of review.

### 2. Jacobson *Standard*

Some Defendants argue that when the state acts to protect public health it is entitled to a special standard of review articulated in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). That case concerned the constitutionality of a Massachusetts law requiring adults to take a smallpox vaccine or pay a fine. *Id*. at 12. The Court declined to second-guess the judgment of the legislature on the

efficacy and propriety of the law, and suggested that it should be struck down only "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id*. at 31.

Whether the *Jacobson* standard should be applied in this case is up for debate. The district court did not apply the *Jacobson* standard. And neither we nor any party has identified a case applying that standard when the restriction at issue would otherwise undergo rational-basis review. When cited recently in this circuit, the discussion centered on whether *Jacobson* authorizes more deferential review of restrictions burdening rights that had been recognized as fundamental. *See Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 925–27 (6th Cir. 2020). And in a case similar to this one (discussing gym shutdowns) the court cited *Jacobson* only for the general proposition that state officials are afforded wide latitude in responding to pandemics, and then went on to apply rational-basis review. *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 127–28 (6th Cir. 2020) (per curiam) (order).

We need not decide here whether *Jacobson* establishes a more lenient standard than rational-basis review. Rational-basis review is itself highly deferential. "Under a rational basis review, a statute is valid if it rationally furthers a legitimate government interest." *LensCrafters*, 403 F.3d at 806. And "the statute will be accorded a strong presumption of validity, and we must uphold the statute 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Ibid.* (quoting *Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001)). The State Defendants have not identified any case that treated the *Jacobson* standard differently than the rational-basis standard or applied the *Jacobson* standard to a restriction on a non-

fundamental right. Therefore, we need not address any application of the *Jacobson* standard and will apply rational-basis review.

### 3. Applying Rational-Basis Review

"Under rational basis scrutiny, government action amounts to a constitutional violation only if it is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Township of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)). A court "will be satisfied with the government's 'rational speculation' linking the regulation to a legitimate purpose, even 'unsupported by evidence or empirical data.'" *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011) (quoting *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002)). "Thus, if a [government action] can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny." *Ibid.*

The Plaintiffs baldly claim that the orders would not survive rational-basis review. Defendants, however, identify a rational explanation for why dance studios should be shut down in response to the sudden arrival of an airborne virus: dancing involves numerous people in close contact engaged in aerobic activity. Requiring masks (to the extent that the requirement limits the Plaintiffs' right to work, as alleged) similarly has the facially rational basis of minimizing the spread of the virus.

Defendants need not offer any empirical support for their explanation, nor need they demonstrate that ordering the shutdowns and requiring masks was wise or efficacious. The bar for

rational basis is low, and the Plaintiffs make no colorable argument that it has not been met here. The Plaintiffs' substantive-due-process claim, therefore, is meritless.[3]

### c. Equal-Protection Claim

The Plaintiffs also argue that they have stated a valid equal-protection claim. In holding otherwise, the district court noted that (1) the Plaintiffs had failed to plead that similarly situated businesses were treated differently and (2) treating dance studios differently than designated essential businesses has a rational basis. We agree with the district court.

To establish an equal-protection violation, "a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted). As discussed above, the orders do not burden a fundamental right, nor do they target a suspect class. The appropriate standard of review is again rational basis.

The Plaintiffs do not identify any similarly situated businesses in their complaint. Instead, they generally complain that the shutdown orders arbitrarily distinguished between essential and non-essential businesses. Making a generous inference, the complaint can be read as arguing that the dance studios were treated differently than essential businesses without a rational basis for that distinction. In their briefing, the Plaintiffs identify grocery stores, gas stations, and dental offices

---

[3] In addition to this substantive-due-process claim, the Plaintiffs seem to raise what might be termed a procedural-due-process claim by asserting that "the orders were enacted without proper legislative process and imposed without an opportunity for public comment on the proposed rules and with no opportunities to appeal the orders once they were enacted and enforced." The Plaintiffs did not argue this before the district court, and the district court did not rule on it. Although some version of that argument does arguably appear in the complaint, the Plaintiffs failed to raise the issue before the district court and it is therefore forfeited. *See Sheet Metal Workers Health & Welfare Fund of N.C. v. L. Off. of Michael A. DeMayo, LLP*, 21 F.4th 350, 355 (6th Cir. 2021).

as examples of businesses that were not shut down despite posing the same "alleged risks" as the dance studios.

Putting aside the fact that the Plaintiffs failed to include those allegedly similarly situated businesses in their complaint, Defendants persuasively argue that dance studios are not similarly situated to those businesses and that treating those businesses differently than dance studios has a rational basis. First, the Plaintiffs "cannot plausibly assert that the type of strenuous physical activity that occurs in dance studios typically occurs at a grocery store or gas station." "And even if any of those businesses had similar risks to dance studios, there are rational reasons to treat those businesses differently due to the critical services they provide." That is enough to pass the rational-basis test.

The Plaintiffs go on to point out what seems to be their thesis: the orders were based on "questionable scientific and political opinions and have not been demonstrated to be applied equally or with effectiveness to the ends in which they are allegedly directed, that is, stopping the spread of a communicable disease." But the orders need not have been applied equally—and need not have been empirically demonstrated to reach a certain level of effectiveness—to survive rational-basis review. The Plaintiffs do not, for example, argue that the dance studios were treated differently than other businesses that host strenuous physical activity.

The Plaintiffs also seem to argue that their equal-protection rights were violated because there were no standards in place to prevent the orders from being enforced arbitrarily. This argument fails because the Plaintiffs do not plead that the orders actually *were* enforced arbitrarily. For those reasons, the Plaintiffs' equal-protection claim lacks merit, and we affirm the district court's dismissal of it.

13

### d.  Takings Claim

#### 1.  *Whether Restrictions Issued Pursuant to Police Power are Takings*

The Plaintiffs next argue that the orders were compensable takings under the Fifth Amendment. The district court disagreed. It first held that health-related orders issued pursuant to a state's police powers are not compensable takings, and then held that the Plaintiffs failed to allege that they had been deprived of all beneficial use of their property. We hold that the district court erred in its reasoning but affirm the result.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). The Supreme Court has also acknowledged "that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Ibid.* While the Court's "regulatory takings jurisprudence cannot be characterized as unified," the various tests each aim "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id.* at 539.

The Court has gone on to "stake[] out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes." *Id.* at 538. The first is a permanent physical invasion of property. *Ibid.* The second category comprises "regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Ibid.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992) (alterations in original)). Beyond those two *per*

*se* categories are other regulatory-takings challenges, which are analyzed pursuant to a standard outlined in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). *Ibid*.

In *Penn Central,* the Court first observed that it had "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." 438 U.S. at 124. It went on to identify three factors to aid in that inquiry: (1) the economic impact of the regulation on the plaintiff; (2) the extent to which the regulation had interfered with the plaintiff's distinct investment-backed expectations; and (3) the character of the governmental action. *Ibid*.

Instead of treating the shutdowns as a regulatory taking and weighing the *Penn Central* factors, the district court concluded that there is no taking when the state acts pursuant to its police powers to protect public health. In support, the court cited *United States v. Droganes*, in which we held that seizure and retention of property under the police power is not a public use. 728 F.3d 580, 591 (6th Cir. 2013). But that case involved the government's failure to return property the plaintiff had agreed to forfeit after being charged criminally. *Id*. at 585. It did not concern the kind of regulatory taking at issue here.

Defendants cite several other cases purportedly holding that exercises of the police power are not compensable takings. Principally, the Defendants rely on *Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470 (1987), decided after *Penn Central*. That case discussed whether the government must compensate property owners when it prevented them using their property for certain purposes. The Court explained that "'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' and the Takings Clause did not transform that principle to one that requires compensation whenever the

15

State asserts its power to enforce it." 480 U.S. at 491–92 (cleaned up) (quoting *Mugler v. Kansas*, 123 U.S. 623, 665 (1887)). And it added that "the public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation." *Id*. at 492.

That language reaffirms the principle that the state has a strong interest in preventing harm to the public, and that public harm can in some instances outweigh an owner's interest in private property. Nevertheless, the Court went on to weigh those property owners' interests before concluding that the record did not support a finding that a statute (as-yet unenforced) entitled the owners to compensation. *Id.* at 501-02.

In short, no appellate court seems to have applied the police-power language so broadly as to categorically declare that no state response to a public-health emergency could be a taking. True, this police-power exception has been applied in the context of criminal forfeitures and abating nuisances. But to hold that a regulation intended to benefit public health can *never* be a compensable taking would be an unwarranted extension of existing precedent.

We therefore analyze this issue under the *Penn Central* framework

*2. Application of the* Penn Central *Factors*

The district court was right to conclude that this is not a *per se* regulatory taking because the Plaintiffs have not pleaded that they were left with no economically beneficial use of their property. We therefore apply the *Penn Central* factors. The first two factors—the economic impact of the regulation on the plaintiff and the extent to which the regulation had interfered with the plaintiff's distinct investment-backed expectation—weigh in favor of the Plaintiffs. While the Plaintiffs have only vaguely referenced the negative economic impact of the shutdown orders, no party seriously disputes that those factors have not been pleaded here.

But the third factor—the character of the government action—weighs even more heavily in the Defendants' favor. This factor is dispositive for two reasons. First, the action was taken to protect public health by reacting quickly in the face of a fast-spreading and novel virus. The Plaintiffs criticize this conclusion as demonstrating "unconscious or implicit bias towards the official government narrative on the dangers posed by Covid-19 and the unscientific methods for its containment." This extraordinary assertion is presented without any factual support. And beyond the fact that it presupposes conspiratorial bad faith on the part of a variety of state officials, it ignores the fact that these orders were issued at the very beginning of the pandemic, when no government official could possibly have had the kind of information about the efficacy of its particular actions that the Plaintiffs demand.

Second, the shutdown orders were in effect for only a little over two months. "[T]he duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Plan. Agency*, 535 U.S. 302, 342 (2002). That case analyzed a *per se* regulatory taking, but the language applies equally here. The relatively short duration of the closure, while undoubtedly frustrating to the Plaintiffs, weighs in favor of the government. And the Plaintiffs make no specific argument that the post-reopening masking requirement constituted a taking.

Because the third factor weighs heavily in the Defendants' favor, there has been no regulatory taking. As the State Defendants laid out, every one of the many courts to have analyzed the *Penn Central* factors has concluded the same. *See, e.g.*, *TJM 64, Inc. v. Harris*, 526 F. Supp. 3d 331, 338–39 (W.D. Tenn. 2021). We therefore hold that under the *Penn Central* test, the Plaintiffs nevertheless failed to state a takings claim.

We sympathize with the Plaintiffs' frustration that they were forced to shut down their businesses, give up income, and endure the uncertain difficulties of the pandemic. We also understand that they felt—rightly or wrongly—that some of the government's actions in response were arbitrary or misguided. But facing the unexpected arrival of a virus of unknown destructive capacity, the government was forced to act and to act quickly. The Plaintiffs have not demonstrated that those actions violated their constitutional rights. For that reason, the district court was correct to dismiss the complaint for failure to state a claim.

## III.    Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of the complaint with prejudice.